L. KIERAN KIECKHEFER, SBN 251978
  KKieckhefer@gibsondunn.com
JOSEPH A. GORMAN, SBN 267553
  JGorman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone:    415.393.8200
Facsimile:    415.393.8306

ILISSA SAMPLIN, SBN 314018
  ISamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
Telephone:    213.229.7354

CHARLOTTE JACOBSEN (*pro hac vice* forthcoming)
  CJacobsen@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:    212.351.4000

*Attorneys for Plaintiff Atmo, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ATMO, INC.,<br><br>             Plaintiff,<br><br>     v.<br><br>KOKI MASHITA; AEOLUS LABS, INC.,<br><br>             Defendants. | Case No. 3:25-cv-05652<br><br>COMPLAINT FOR:<br><br>**1. FEDERAL MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. §§ 1836, *et seq.*)**<br><br>**2. STATE MISAPPROPRIATION OF TRADE SECRETS (Cal Civ. Code §§ 3426, *et seq.*)**<br><br>**3. BREACH OF CONTRACT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**INJUNCTIVE RELIEF SOUGHT** |

Plaintiff Atmo, Inc. ("Atmo"), by way of its Original Complaint against Defendants Koki Mashita and Aeolus Labs ("Aeolus") (together, "Defendants") states and alleges as follows:

### INTRODUCTION

1.    In the summer of 2024, defendant Koki Mashita—a Thiel Fellow, venture capital scout, and fund manager—exploited his trusted position as a consultant for Atmo, Inc., a leading AI weather simulation startup, to misappropriate its valuable technical and business trade secrets to accelerate the launch of his rival venture.  The pattern of theft is textbook misappropriation—Mr. Mashita accessed a variety of confidential information that he had no business purpose to access **right before** he left Atmo; he then accessed confidential and trade secret information shortly **after** he had left Atmo (including a confidential trade secret document about significant customers); and he **retained** a variety of Atmo documents, including a portion of Atmo's confidential and trade-secret-protected source code **after** he left Atmo.  It gets worse.  In December of 2024, Mr. Mashita co-founded Aeolus Labs, itself an AI weather simulation startup, and is now **competing with Atmo** for two of the very same significant customers about whom he stole highly technical trade secret information.  There is no way that Mr. Mashita and Aeolus could have created a viable, competitive offering to Atmo's in the fewer than six months since Aeolus's founding, particularly not for those significant customers, **unless** Mr. Mashita and Aeolus used the technical and business trade secrets that Mr. Mashita had improperly accessed and/or stole from Atmo.

2.    Over the course of several months, Mr. Mashita collected a strategic blueprint of Atmo's trade secret and confidential business and technical information that could accelerate his ability to (i) create a competitive technology and (ii) bid on, win, and execute complex weather simulation projects with Atmo's significant customers.  Specifically, Mr. Mashita accessed and/or stole:

- An overview of significant Atmo customers, and the timeline of technical deliverables for each customer;
- Technical product requirements for a specific Atmo customer he would later approach;
- Source code for a portion of Atmo's AI programs, algorithms, and model architectures for weather and atmospheric simulations;

COMPLAINT

Gibson, Dunn & Crutcher LLP

- Atmo's offer letters to key engineers; Atmo's capitalization table; and information in Atmo's Series A data room.

3.     In total, review of the forensic records revealed that Mr. Mashita had improperly accessed over 50 folders and documents.  Moreover, by his own admission, Mr. Mashita was still in possession of over 200 critical Atmo files months after the end of his consultancy.

4.     Atmo, Inc. is a pioneering artificial intelligence ("AI") weather simulation company that helps predict and modify weather with a goal of saving lives worldwide.  Driven by a positive social mission, Atmo seeks to deliver atmospheric simulations that are up to 40,000 times faster, 100 times more detailed, and significantly more accurate than prior technologies while supporting weather modification missions to mitigate droughts and hurricanes.  The company helps vulnerable nations like Tuvalu adapt to rising seas and the Philippines to prepare for typhoons.  As one of the first companies to deploy live AI weather simulations in daily use, Atmo earned recognition as one of TIME's Best Inventions of 2024.  This is technology with purpose: using AI to make weather work for humanity, not against it.

5.     As a consultant to Atmo, Mr. Mashita signed and was bound by multiple confidentiality agreements, including a Mutual Nondisclosure Agreement, a Consulting Agreement, and a Confidential Information and Invention Assignment Agreement.   These agreements required Mr. Mashita to safeguard Atmo's confidential information.  Given his prior experience investing in early-stage companies, Mr. Mashita would have been familiar with such agreements and understood that he was expected to keep Atmo's information confidential.

6.     Atmo first became concerned about issues relating to Mr. Mashita and Atmo's confidential and trade secret information in November of 2024 (approximately two months after Mr. Mashita had left his paid summer consultancy) because Atmo had learned that Mr. Mashita intended to compete with Atmo.  Atmo inquired directly with Mr. Mashita, who promised he would not use Atmo's trade secret and confidential information and denied that he was planning to compete with Atmo.  Mr. Mashita doubled down on these promises in a letter from his attorney confirming the same to be allegedly true, which calmed Atmo.

7.      Six months passed and, in May of 2025, Atmo was informed that Mr. Mashita was, in fact, competing with Atmo via his newly formed company, Aeolus Labs, and was allegedly competing with Atmo *for at least two specific Atmo customers* that Mr. Mashita had misappropriated detailed trade secret information about.

8.      One month later, in mid-June of 2025, Atmo was further informed by the CEO of another Atmo customer that Mr. Mashita admitted both that Aeolus was built by incorporating insights from alleged problems with Atmo's models and that he believed Atmo may *have grounds to sue him* for what he had done.

9.      Just a few days later, on June 26, 2025, Atmo was informed that Mr. Mashita and Aeolus had signed a $12 million term sheet for venture capital with funding to close imminently.  On information and belief, Mr. Mashita and Aeolus will soon have the funding to *productize use of Atmo's trade secrets and call that offering their own*.  In other words, on information and belief, Mr. Mashita and Aeolus will be using Atmo's own business information to get a head start on Atmo's customers and using Atmo's own technical information to get a head start on a competitive offering.

10.      Atmo seeks the Court's urgent intervention to protect its investors, employees, and its company.  Mr. Mashita's systematic misappropriation and use of improperly accessed and/or stolen information to compete with Atmo represents precisely the kind of unfair competition that trade secret law exists to prevent.  Atmo will be irreparably harmed with every day that allows Mr. Mashita to further embed these illegitimate advantages into Aeolus's operations and compound the harm to Atmo's business.  Atmo respectfully asks the Court to act now to halt this misappropriation and ensure that competition in this space remains legitimate and fair.

## THE PARTIES, JURISDICTION, AND VENUE

11.      Atmo, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  It was incorporated in 2019.

12.      Koki Mashita is an individual who at all times relevant herein consulted, was employed, and/or conducted business in Berkeley and San Francisco, California.  On information and belief, Mr. Mashita resides in Berkeley, California, which is located in Alameda County, in the Northern District of California.

Gibson, Dunn & Crutcher LLP

13.     Aeolus Labs, Inc. is a Delaware corporation with its principal place of business in Los Angeles, California and, on information and belief, an office in San Francisco, California.  It was co-founded in 2024 by Defendant Mashita and Mr. Mason Lee.

14.     This Court has jurisdiction in this action pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the other claims pled herein pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because Mr. Mashita is a resident in this district, such that he is subject to the general jurisdiction in this District. In addition, a substantial part of the events or omissions giving rise to the claims pled herein took place in this District.  Specifically, Atmo is headquartered in San Francisco, and Mr. Mashita worked for Atmo at their San Francisco offices.  Moreover, Mr. Mashita agreed to, and executed, a Consulting Agreement, a Confidential Information and Invention Assignment Agreement, and Mutual Nondisclosure Agreement with Atmo, which he breached in this District.

16.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c) and General Order No. 44 because this action is an intellectual property action, it is properly assigned to any of the divisions of this District and is subject to assignment on a district-wide basis.

## FACTS

### Atmo Is a Pioneer of AI Meteorology to Protect Lives by Simulating, Forecasting, and Modifying Weather

17.     Founded in 2019, Atmo is the leading company bringing AI to meteorology.  Unlike traditional weather-simulation models, which run only a limited number of simulations per day following a fixed set of rules, Atmo's AI models of weather can run thousands of times faster and at higher resolutions, and use machine learning to progressively improve accuracy of their predictions. This speed, efficiency, and precision makes Atmo's weather-simulation models uniquely useful in both weather *forecasting* and weather *modification* (some types of which are referred to as "cloud seeding," "rain seeding," "precipitation enhancement," and "geoengineering," among other terms).  Atmo's proprietary AI-based weather simulation software combines real-time data from millions of weather sensors, satellites, and radars with over 40 years of historical data to create these ultraprecise

COMPLAINT

Gibson, Dunn & Crutcher LLP

AI weather prediction models.  These models can update every 15 minutes and continuously self-correct using real weather measurements, improving over time.  Atmo's models can consider numerous potential scenarios to identify when and where changes in the weather will take place, as well as where weather modification interventions may be most effective.  As noted, TIME magazine recognized Atmo's ultraprecise AI weather simulation system as one of the Best Inventions of 2024.

18.    Atmo's weather simulation models operate on both a global and regional scale.  Atmo's regional simulation engine combines AI weather simulations, AI ensembles, on-demand arbitrary-resolution nested grids, and continuous data assimilation of real-time observations; this workflow not only explores the full range of possible weather scenarios but also outputs precision maps that pinpoint where and when weather modification actions could be most effective.

19.    Such precise weather simulation technology involves calibrating thousands of variables with millions of potential combinations.  That calibration requires significant investment of time and resources; for each successful model that Atmo develops, Atmo may first experiment with up to ten unsuccessful models, with each model relying on thousands of gigabytes of data and tens or even hundreds of thousands of dollars of computing costs to process and store that data.

20.    By reason of its precise weather simulation technology, Atmo has rapidly become the trusted AI meteorology partner for governments, international non-governmental organizations, militaries, and corporations (such as aerospace companies) across the world.  As one example, Atmo works with weather-vulnerable nations like Tuvalu and the Philippines to help them address rising sea levels and typhoons.  One ultimate goal of such efforts is to save lives by giving countries and individuals more precise and more advance notice of impending catastrophic weather conditions, and to provide roadmaps for weather modification to improve those conditions.

21.    Atmo's sophisticated meteorology is used to support beneficial manipulation of weather, also known as weather modification.  Companies like Rainmaker Technology Corp. make use of Atmo's weather forecasting and weather modification AI technology to practice cloud seeding and precipitation enhancement, wherein aircraft such as drones introduce substances into clouds that encourage rain or snow to fall.  Without Atmo's proprietary weather simulation models, customers like Rainmaker may not be able to engage in weather modification as reliably or successfully.

22.    Given the specialized nature of companies in this space and the highly sophisticated requirements of Atmo's globally significant customers, Atmo prizes its customer relationships and closely protects, and keeps confidential, the information related to its customers' requirements and product development.

**Atmo Safeguards the Secrecy of Its Confidential and Proprietary Information**

23.    Atmo invests considerable time, money, and effort to protect the secrecy of its proprietary information and ensure such information is not disclosed outside the company or to the public generally.  All Atmo personnel understand their confidentiality obligations, as well as the inappropriateness of accessing information irrelevant to an individual's job functions.

24.    Atmo requires its consultants to sign a Consulting Agreement (Exhibit A) and a Confidential Information and Invention Assignment Agreement ("CIIA Agreement") (Exhibit B). Although this case centers on a consultant, employees are also required to sign the CIIA Agreement.

25.    Both agreements contain a confidentiality provision that (i) requires consultants to maintain the confidentiality of Atmo's confidential information, (ii) prohibits consultants from using Atmo's confidential information in an unauthorized manner, and (iii) prohibits consultants from making copies of any confidential information except as authorized by Atmo or in the ordinary course of their obligations to Atmo.  Specifically, the Consulting Agreement and CIIA Agreement state:

> At all times during the Relationship and thereafter, Consultant shall hold any and all Confidential Information that Consultant obtains, accesses, or creates during the Relationship in strictest confidence, shall not use such Confidential Information except for the Company's benefit and to the extent necessary to perform Consultant's obligations to the Company in connection with the Relationship, and shall not disclose such Confidential Information to any third party without written authorization from the Company in each instance.  Consultant shall comply with the foregoing obligations whether or not during working hours, until the information at issue is no longer Confidential Information as described herein.  Consultant will not make copies of any Confidential Information (including any documents, records, files, media, or other resources containing any Confidential Information) except as authorized by the Company or in the ordinary course of Consultant's obligations to the Company in connection with the Relationship.  (Ex. A, § 7(b); *see also* Ex. B, § 2(b).)

Gibson, Dunn & Crutcher LLP

26. Both the Consulting Agreement and CIIA Agreement also contain a provision that prohibits Atmo consultants from improperly using or disclosing certain company data and requires them to delete Atmo's data upon departing Atmo. Specifically, the Consulting Agreement and CIIA Agreement state:

> Consultant acknowledges that in the course of the Relationship Consultant may collect, receive, access, or use Personal Information and/or other Confidential Information, relating to the Company's customers, potential customers, end-users, suppliers, potential suppliers, employees, independent contractors, and other personnel, or others (collectively, "Company Data"). . . . Consultant agrees to collect, receive, access, use, retain and disclose Company Data (i) in compliance with all applicable laws and (ii) solely for the purpose of performing the Services and for no other commercial purpose. Consultant shall not collect, receive, access, use, retain or disclose Company Data outside of Consultant's direct business relationship with the Company, and shall not combine Company Data with any other information that Consultant receives from or on behalf of another person or business unless specifically requested by the Company. Consultant shall not sell or disclose Company Data to any third party without the Company's prior written consent unless required by applicable law. . . . Consultant further agrees to delete and permanently destroy the Company Data promptly (i) upon request by the Company, and (ii) upon termination of the Relationship. (Ex. A, § 10(b); *see also* Ex. B, § 5(b).)

27. These agreements also require consultants to disclose any intellectual property the consultant develops during their relationship with Atmo, as well as any intellectual property developed in connection with that relationship in the 12 months following the consultant's departure from Atmo:

> Without limiting the generality of the foregoing, during the Relationship and for a period of twelve (12) months thereafter, Consultant will promptly make full written disclosure to the Company of all IP that Consultant solely or jointly authors, discovers, develops, conceives, or reduces to practice during the period of, or otherwise in connection with, the Relationship for, among other things, the Company to determine which IP is Company IP and which is Excluded IP. (Ex. A, § 8(d)(i); *see also* Ex. B, § 3(d)(i).)

28. And to further protect Atmo proprietary information after a consultant leaves Atmo, the agreements require that:

> During the Restriction Period [defined as "period of twelve (12) months immediately following the termination of the Relationship"], Consultant shall inform any entity or person with whom Consultant may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of Consultant's contractual obligations under this Agreement.  (Ex. A, § 11(b); *see also* Ex. B, § 6(b).)

29.    Additionally, customers, employees, interns, and consultants are required to sign a Mutual Non-Disclosure Agreement with Atmo before any Atmo proprietary information is disclosed to them.  These Mutual Non-Disclosure Agreements require both parties to agree that:

> Recipient shall not use any Confidential Information disclosed to it by Discloser for its own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Relationship. Recipient shall not disclose or permit disclosure of any Confidential Information of Discloser to third parties or to employees of Recipient, other than directors, officers, employees, consultants and agents of Recipient who are required to have the information in order to carry out the discussions regarding the Relationship.  (Ex. C, § 2.)

30.    The Mutual Nondisclosure Agreement further prohibits signatories from copying or duplicating any of Atmo's confidential information, specifically providing:

> Recipient shall, except as otherwise expressly authorized by Discloser, not make any copies or duplicates of any Confidential Information.  Any materials or documents that have been furnished by Discloser to Recipient in connection with the Relationship, together with all copies of such documentation (if any), shall be promptly returned or destroyed by Recipient within ten (10) days after (a) the Relationship has been rejected or concluded or (b) the written request of Discloser[.]  (Ex. C, § 4.)

31.    The Atmo proprietary and trade secret information at issue in this case falls within the scope of all three agreements.  *See* Ex. C, § 1; Ex. A, § 7(a); *see also* Ex. B, § 2(a).

32.    Access to Atmo's confidential and trade secret information is carefully guarded.  In particular, Atmo's source code is stored in a secure GitHub repository to which employees generally do not have access.  If a particular employee needs access to the source code, they are ultimately granted access only with permission of both Atmo's Chief Technology Officer and its Head of Engineering. In other words, Atmo's source code is kept secret even within Atmo, and shared only with a limited

Gibson, Dunn & Crutcher LLP

number of employees on a need-to-know basis.  Only seven people had access to Atmo's source code at the times relevant to this action.

33.    Moreover, because Atmo performs services for globally significant customers, Atmo has a culture of security and strict confidentiality.  Even the mere fact that Atmo is performing work for certain customers is considered confidential given the nature of the work being performed.

34.    While Atmo takes every measure to protect its proprietary information, no system—not even Atmo's—is entirely safe from a trusted individual exceeding and/or abusing their access for personal gain.

**Mr. Mashita Gains Trust as an Atmo Team Member and Signs Multiple Protective Agreements**

35.    Here, that trusted individual is Koki Mashita, who gained Atmo's trust and used his position to steal from Atmo and, on information and belief, use that stolen information to set up his own company, give that company an improper head-start with Atmo's hard-won technological advances, rush to steal Atmo's customers, and stand on the brink of a multi-million dollar funding payday to take Atmo's trade secrets and productize them.

36.    Mr. Mashita was introduced to Alexander Levy, the Co-Founder and CEO of Atmo, in August of 2022, when Mr. Mashita was a student at the University of California, Berkeley.  Mr. Mashita reached out to Atmo, visited their office in September 2022, and ultimately expressed interest in working for Atmo.  To accommodate Mr. Mashita's ongoing studies at Berkeley, Atmo took him on as an intern, starting on September 27, 2022, and offered him flexible scheduling.

37.    Mr. Mashita's work for Atmo involved software engineering and thus required access to Atmo's confidential documents and source code.  Thus, Atmo and Mr. Mashita entered into a Mutual Non-Disclosure Agreement effective September 27, 2022.  (Ex. C.)

38.    In the summer of 2024, Atmo retained Mr. Mashita as a consultant, a role he held from June 26, 2024, to August 26, 2024.  In connection with this work, Atmo and Mr. Mashita entered into a Consulting Agreement (Ex. A) and a CIIA Agreement (Ex. B), both effective June 26, 2024.

39.    In the course of his consulting work, Mr. Mashita worked on Atmo's source code.  As such, he was given access to some of Atmo's proprietary information, including Atmo's source code, technical specifications, and customer identities.  Mr. Mashita was also given the opportunity to travel

COMPLAINT

Gibson, Dunn &
Crutcher LLP

on Atmo's behalf to the US-ASEAN Business Council 2024 Singapore Business Mission, to promote business relationships with companies and governments in the region.  As part of that travel, Mr. Mashita identified weather modification and/or geoengineering as one of Atmo's strongest business offerings to Singapore, exclaiming in his talking points that "I feel like Singapore would be THE country that would be open for geoengineering . . . could we possibly talk about this? Related to Rainmaker type."  Rainmaker is an Atmo customer engaged with Atmo in weather modification and cloud seeding.

40.     Throughout his work with Atmo, Mr. Mashita received personal mentorship from Atmo's co-founders and engineers, who took the time to explain Atmo's revolutionary technology to him.

41.     At the end of August 2024, Mr. Mashita received the final paycheck under his consulting agreement with Atmo; his consulting position with Atmo was over on August 26, 2024.  Atmo believed he was returning to school full time.

42.     But, shortly after Mr. Mashita left, signs began to emerge that suggested Mr. Mashita had abused Atmo's trust for his own benefit.

**The Dallas Warning: "How do you feel about your intern competing with you?"**

43.     On November 7–10, 2024, Mr. Levy attended the Dialog Emerging Conference in Dallas, Texas.  Mr. Mashita also attended the conference.  On information and belief, during this conference, Mr. Mashita told another technology entrepreneur in attendance that Mr. Mashita was starting his own company.  The entrepreneur subsequently relayed this information to Mr. Levy, asking him, "How do you feel about your intern competing with you?"  This entrepreneur described Mr. Mashita's new venture as one that would focus on AI weather simulation and modification for governments, militaries, and non-governmental organizations.  This was an exact focus of Atmo's technology and of the confidential and trade secret information to which Mr. Mashita had significant access while at Atmo.

44.     After this conversation, at the same conference, Mr. Levy spoke to Mr. Mashita to inquire about what he had heard regarding Mr. Mashita's plans.  Mr. Mashita confirmed what the other entrepreneur had said:  he was working on AI for weather modification, and he described many

COMPLAINT

techniques and goals that were highly similar to Atmo's techniques and goals. This was concerning because Atmo had been working for years toward similar objectives and with similar customers—and, due to Mr. Mashita's position, he had had access to certain of Atmo's confidential and trade secret information. Mr. Levy wanted to make sure Mr. Mashita adhered to his confidentiality obligations to Atmo.

**November 2024 Discussion: Mr. Mashita Swears He Won't Use Atmo's Trade Secrets**

45.    Based on the information learned in Dallas, Atmo personnel coordinated with Mr. Mashita to schedule a meeting about his new project and to make sure Mr. Mashita was not using Atmo's confidential and proprietary information to unfairly compete. On or around November 13, 2024, Mr. Levy and Johan Mathé (Co-Founder and Chief Technology Officer at Atmo) met with Mr. Mashita and his newly identified co-founder, Mason Lee. Messrs. Mashita and Lee advised Messrs. Levy and Mathé that they were starting a research-focused weather modification endeavor that used AI but swore to Messrs. Levy and Mathé that they would not use Atmo's trade secrets or confidential information and did not intend to compete with Atmo. Messrs. Mashita and Lee also stated their organization would likely would not have contracts for a long time. Their reassurance was unequivocal. Messrs. Levy and Mathé were comforted by Messrs. Mashita and Lee's assurances and representations.

**Forensics Reveal Concerning Access by Mr. Mashita,**
**From Capitalization Tables to Customer Specifications**

46.    Despite being calmed by the meeting with Messrs. Mashita and Lee, Atmo began reviewing its system access logs in Atmo's Google Drive to evaluate whether there were any issues that should be further addressed. Atmo was shocked to discover that, throughout the summer, Mr. Mashita had accessed a substantial number of Atmo files that were unrelated to his projects as an intern or consultant and that, after he left his consulting position, Mr. Mashita *continued* to access Atmo's confidential and proprietary information, going so far as to download certain documents to his personal device.

47.    In particular, weeks after his consultancy had ended, Mr. Mashita downloaded to his device a document laying out the plan of action and technical specifications for Atmo's work for

Customer A, as well as a document showing the status of Atmo's work for ten customers including Customer A and Customer B.  Moreover, Mr. Mashita had viewed confidential documents unrelated to his assigned Atmo work, such as Atmo's capitalization table (showing its stock allocations to employees, advisors, and investors) and compensation offer letters for key engineers.  These files are discussed in greater detail below in Paragraphs 61–67 and 73.

**Atmo Seeks An Explanation and Mr. Mashita's Lawyer Promises No Use and No Competition**

48.    Following Atmo's preliminary review of Mr. Mashita's accessing and downloading sensitive Atmo trade secret and confidential files, on or around November 21, 2024, Atmo's founders sent a letter to Mr. Mashita expressing their concerns with his conduct and intentions for his new company.  The letter explained that Mr. Mashita's new venture appeared to breach numerous provisions of Mr. Mashita's agreements with Atmo, including his Consulting Agreement, Confidential Information and Invention Assignment Agreement, and Non-Disclosure Agreement.  The letter also explained the initial findings of Atmo's preliminary review of Mr. Mashita's access logs, including that Mr. Mashita had repeatedly accessed confidential company materials unrelated to his role at Atmo, and asked for an explanation.  Finally, the letter laid out Atmo's concerns that Mr. Mashita was using and/or planning to use Atmo's confidential information and trade secrets at his new company.

49.    In response, on or around November 26, 2024, Atmo received a letter from counsel representing Mr. Mashita.  The letter admitted to Atmo that Mr. Mashita had retained numerous Atmo files on his personal computer, including everything from Atmo proprietary source code, to confidential weather customer sensor data, to outputs and analyses of Atmo weather simulation models.  These documents are discussed in greater detail at Paragraphs 68–72.

50.    Despite this, the letter took care to placate Atmo and made representations intended to allay Atmo's fears.  Specifically, Atmo was provided detailed assurances, by Mr. Mashita's attorney, that Mr. Mashita "ha[d] not, and w[ould] not, ever use or disclose any trade secret (or otherwise legally protected) information of Atmo," was "not compet[ing] with Atmo's business," and was not "solicit[ing] any employee or customer of Atmo."  Having worked with Mr. Mashita for two years and given him a position of trust, Atmo was assuaged by these assurances.

**Months Later, Emails and Photos Expose the Lies: Mr. Mashita Founds Aeolus Labs and Is Pursuing Two Significant Atmo Customers**

51.     Everything changed in May and June 2025, when Atmo began receiving crucial evidence that Mr. Mashita likely is, and has been, using Atmo's trade secret and confidential information.

52.     On or around May 7, 2025, an Atmo investor forwarded Mr. Levy an email regarding the April 2025 Aeolus Labs Monthly Investor Update.  The original email was sent by Mr. Mashita and Mr. Lee on or around May 3, 2025, and provided an update on recent Aeolus activities, including that Aeolus personnel "[m]et with [Senior Official of Customer B]" and that "a [senior official] in [Customer A] agreed to write a Letter of Support for D2P2 SBIR."

53.     Atmo became concerned upon reviewing this email for several reasons.   First, Customer B is one of Atmo's largest clients.  Second, a "D2P2 SBIR" refers to a "Direct to Phase II Small Business Innovation Research" application to a federal agency (in this case, to Customer A). The fact that this application was "Direct to Phase II" indicates that Aeolus was seeking to bypass the typical first phase of such research applications.  Phase I generally focuses on establishing the technical merit and feasibility of the proposed project, while Phase II generally allows for continued research and development.  Atmo itself went through a Phase I process—the entirety of which from beginning to end took almost two years—before proceeding to its current Phase II stage.  It did not seem possible that Aeolus could have credibly bypassed Phase I, given Aeolus was founded less than six months ago.

54.     The evidence showed Aeolus was intensely competing for two Atmo customers (Customer A and Customer B).  Atmo was concerned about Aeolus pitching to these customers given Mr. Mashita's prior behavior with regard to Atmo's confidential and trade secret information, but it did not seem possible that Aeolus had either the technical ability to present a viable offering or the finances to deploy one.  Atmo was aware from its own experience that it takes years of research and development to produce a product to satisfy highly sophisticated customers in this industry and that deploying a successful AI model at an industrial scale requires a significant investment.

**Third Atmo Customer Confirms: Mr. Mashita Admits Use of Atmo Trade Secrets and Fears of Lawsuit to Rainmaker CEO**

55.     When it rains, it pours.  A few weeks after the forwarded email, on or around June 13, 2025, Mr. Levy spoke with Augustus Doricko, the founder of Rainmaker Technology Corporation, a cloud-seeding weather modification startup and Atmo customer.  Mr. Doricko relayed that he had several conversations with Mr. Mashita in Abu Dhabi at the Rain Enhancement Forum in January of 2025.  There, Mr. Mashita told Mr. Doricko that he had previously worked at Atmo but had founded a new company called Aeolus Labs.  Mr. Mashita explained that the key technology being used at his new company, Aeolus, was AI ensemble simulation techniques for weather modification—technology that is highly correlated with internal Atmo confidential trade secret information.  Mr. Mashita told Mr. Doricko that he had seen Atmo's models.  Mr. Mashita then disparaged Atmo's models, although he did not identify any specific problems.  He stated that he was going to ***incorporate those insights about the alleged problems with Atmo's models into a new system at Aeolus***.  Mr. Mashita indicated to Mr. Doricko that he was pursuing several customers, including Customer A (an Atmo customer).  Lastly, Mr. Mashita concerningly stated to Mr. Doricko that he believed Atmo may have grounds to sue him.

56.     This conversation with Mr. Doricko confirmed for Atmo that Mr. Mashita and Aeolus were advertising their capabilities in Atmo's key areas to Atmo's key customers, that Defendants intended to present proposals to compete with Atmo for certain key clients, and that Defendants' offerings were at an implausibly advanced stage given a purported company creation date of only six months earlier.  If Aeolus was truly at such an advanced stage, the most likely explanation was that it was using the confidential and proprietary information that Mr. Mashita had stolen.  Further, importantly, any intellectual property that Mr. Mashita made or conceived of while working for Atmo ***would be owned by Atmo***—not Mr. Mashita and certainly not Aeolus—pursuant to the agreement Mr. Mashita signed with Atmo.

57.     Nonetheless, Atmo knew that actually deploying a product for Customer A or Customer B would require extensive financing, which Atmo did not believe Aeolus yet had.

Gibson, Dunn & Crutcher LLP

**Aeolus Soon To Receive Millions in Funding and Expected to Build Offerings Using Atmo Trade Secrets**

58.     Finally, Atmo has just learned that Mr. Mashita and Aeolus are not only using their ill-gotten gains to solicit Atmo customers, but are, on information and belief, also using them to secure significant amounts of funding.

59.     Specifically, Atmo was informed on June 27, 2025, that Mr. Mashita and Aeolus had signed a $12 million term sheet for venture capital, with funding to close imminently.  Thus, on information and belief, Mr. Mashita and Aeolus will soon have the funding to productize use of Atmo's trade secrets and call that offering their own.  In other words, on information and belief, Mr. Mashita and Aeolus will be using Atmo's own business information to get a head start on Atmo's customers, and using Atmo's own technical information to get a head start on a competitive product offering, which they could not have done without using Atmo's trade secrets and confidential information.

60.     At this point, it became clear to Atmo that Aeolus was not only meeting with Atmo customers but that it is holding itself out as actually having the capabilities to make a competitive bid. Atmo had suspected that Aeolus was meeting with these customers in May, but Mr. Levy's conversation with Mr. Doricko in June confirmed that Aeolus was purporting to provide offerings that are highly correlated with internal Atmo confidential information and know-how that Mr. Mashita could not have developed without theft of confidential and trade secret information from Atmo.  And the June 27 email revealed that Aeolus was on the verge of securing the funding it would need to productize the confidential and trade secret information Mr. Mashita had stolen.  As a result, Atmo is forced to take action to halt any further misuse of the critical trade secrets that Mr. Mashita had taken.

**In Sum, Mr. Mashita Improperly Accessed and Retained Numerous Atmo Documents Ranging From Capitalization Tables to Customer Specifications to Source Code**

61.     Mr. Mashita improperly accessed and retained multiple Atmo confidential and trade secret documents near the end of and after his consultancy, and is, on information and belief, using that confidential and trade secret information to unlawfully compete with Atmo.  Between a source code repository and the other files identified in this letter, ***Mr. Mashita is in possession of over 200 Atmo***

COMPLAINT

Gibson, Dunn &
Crutcher LLP

*files*, many of which comprise Atmo's confidential and trade secret information. Below is a discussion of some of the key documents and information:

62.     *First*, Mr. Mashita synchronized the "Task 1 Deliverable – [Customer A] Requirements Document" to a local machine on October 7, 2024, over six weeks after his consultancy with Atmo ended. Mr. Mashita synchronized (or downloaded) the file to his device, meaning he kept the document.

63.     This Customer A Requirements Document lays out Atmo's plan of action and timeline to develop, train, test, and deploy a weather simulation model for Customer A that is capable of high-speed weather forecasting to be used as one of the primary data sources for particle dispersion analysis. In particular, it reflects Atmo's recipe for AI weather simulations that it believes will be successful and will satisfy the requirements of Customer A, including the location and parameters of running the model and even specific numerical data for the ideal atmospheric vertical levels to use to generate the dataset to train the AI model. Selecting the correct set of vertical levels is critical to assure accuracy of the AI model and balance efficiency and computing needs. The Customer A Requirements Document shows the specific combination of variables (out of millions of possibilities) that Atmo planned to use in this model. Thus, within Atmo and the AI industry generally, this type of document and data is considered confidential.

64.     The plan laid out in the Customer A Requirements Document is the result of hundreds of thousands of dollars of investment. Since Atmo began in 2019, it has spent six years and approximately $13 million developing forms of AI weather modeling and learning how to train, test, and deploy these models. The document distills a subset of parameters most likely to yield a successful high-speed dispersion model, thereby giving anyone who sees it an immediate roadmap to a customer-validated design. This plan derives independent economic value from being secret. Possessing these specifications would spare a competitor the months- or years-long (and costly) exercise of eliciting, formalizing, and validating requirements for a sophisticated end-user.

65.     *Second*, Mr. Mashita downloaded the "Customer Success / Programs Weekly.pptx" document to a local machine on September 5, 2024, approximately two weeks after his consultancy with Atmo ended.

COMPLAINT

Gibson, Dunn &
Crutcher LLP

66.     The "Customer Success / Programs Weekly.pptx" document is marked confidential and reflects the status of Atmo's work for ten customers, including Customer A and Customer B.  This document lays out the specific tasks that must be performed for each customer, the durations and deadlines for those tasks, and Atmo's status on each task, indicating Atmo's progress against its planned technical milestones.

67.     The product development information laid out in the "Customer Success / Programs Weekly.pptx" document is kept secret and is highly valuable to Atmo because it names Atmo's key customers and, for a competitor, would identify when to reach out to those customers based on the product completion cycle.  Moreover, the list of tasks to be completed is itself sensitive and valuable because it reflects the results of significant negotiation with leaders and scientific stakeholders from Atmo's significant customers.  Those negotiations result in a customized set of technical milestones for those customers, how such milestones are to be described, and appropriate timelines for each milestone.  Obtaining such a task list without going through these negotiations would give a competitor a significant head-start in creating an offering for these and other major customers in the weather AI space.  It thus derives independent economic value from being secret.

68.     *Third*, the November 26, 2024, letter from Mr. Mashita's counsel admitted that over three months after the end of his consultancy, ***Mr. Mashita was still in possession of numerous Atmo files***, including "Atmo Deck."  "Atmo Deck" refers to a repository which is a portion of Atmo's source code base.

69.     The AtmoDeck code base includes source code for AI programs, algorithms, and model architectures for weather and atmospheric simulation.  AtmoDeck also includes (1) visualization tools; (2) model training information known in the AI field as "losses," particularly for rain and tropical locations; (3) data calibration code, especially for rain measurements with radars, ground stations, and satellite measurements; (4) rainfall estimation deep learning algorithms that are highly relevant to rain modification; (5) metrics for rain forecast performance estimation; (6) data processing and data processing pipelines; (7) and various utilities for testing and benchmarking these AI models.  In short, AtmoDeck shows how some of Atmo's AI models are trained and validated, as well as how to retrieve and process large quantities of weather data from various sources around the world.  Source code is the

most sensitive and proprietary component of Atmo's technology because it shows exactly how some of Atmo's AI models are developed, tested, and deployed.

70.    Although AtmoDeck is not the latest version of Atmo's source code, it is part of the foundation for the current code base and includes significant portions of the overall architecture, including many techniques and models that are still incorporated into Atmo's current technology and used today.  AtmoDeck is kept highly confidential at Atmo.  Very few companies in the world are able to run AI weather forecasts at the grade of which Atmo is capable.  Indeed, globally significant customers have opted to purchase Atmo's solution rather than developing their own AI weather models because of the level of complexity involved.  AtmoDeck is the result of years of effort and nearly 800 separate contributions from software engineers, meteorologists, and scientists; it would give a competitor a significant head start on building their own version of this technology.  Thus, AtmoDeck derives independent economic value from being secret.

71.    The other files identified in the November 26 letter from Mr. Mashita's attorney included a comprehensive presentation regarding Atmo's simulations for Customer A, sample outputs of what Atmo generates for its customers, charts and data showing the error rates of Atmo's simulations as compared to other simulations and customer data, portions of source code related to tracking cyclones in weather simulations, and weather measurements provided by Atmo customers for use in training Atmo AI models.

72.    At least some of these documents relate to cyclone simulation and security-oriented weather simulation projects, which would be of interest to Customer A.  On information and belief, Aeolus is now working on submissions to Customer A related to such subject matter.

73.    Additionally, *during and after* Mr. Mashita's consultancy with Atmo, he accessed over 50 documents and folders for which he had no legitimate business purpose.  On his way out the door, Mr. Mashita accessed Atmo's offer letters and CIIA agreements of other employees, which included salary and benefits information for those employees.  Specifically, between August 20 and August 25, 2024, Mr. Mashita viewed the offer letters for five different Atmo employees (one of whom Aeolus went on to hire).  Mr. Mashita also accessed Atmo's capitalization table, which shows the identities, investment amounts, and stock holdings of all of Atmo's shareholders, including advisors and staff.

Mr. Mashita viewed Atmo's capitalization table on August 25 and August 28, 2024, and ultimately synchronized the file to a local computer as late as November 2, 2024.

**Defendants' Conduct Risks Irreparable Harm to Atmo, Its Employees, and Investors**

74.     Mr. Mashita and Aeolus's misappropriation appears to have given them a substantial head start in developing AI models that require the fine balancing of thousands of variables, which normally takes years to master and refine. Moreover, Mr. Mashita and Aeolus have been able to get a head start in developing these products for highly sophisticated large customers that have strict requirements for their contractors. Aeolus is competing with Atmo and others in this sector on unfair terms—playing dirty while Atmo works hard and invests money to make true technological progress.

75.     For example and as discussed, Mr. Mashita downloaded the "Customer Success / Programs Weekly.pptx," which listed Atmo's customers, including Customer A and Customer B, and the status of each of their projects. Mr. Mashita and Aeolus then proceeded to meet with a senior official of Customer B, which is one of Atmo's largest clients, to pitch Aeolus's "proprietary AI-based microphysics simulator," which would allow Aeolus to "conduct simulations, data collection, and small-scale seeding tests."

76.     Mr. Mashita had also downloaded the Customer A Requirements Document to his local computer, which identified the specific requirements of Customer A and Atmo's plans for a proprietary weather model to satisfy those requirements. This spring, Aeolus and Mr. Mashita worked on a "Direct to Phase II" pitch to Customer A, which represents an advanced stage of development only six months after Mr. Mashita and his co-founder purportedly began working together.

77.     Additionally, Mr. Mashita had reviewed Atmo's confidential business information, such as the capitalization table and offer letters, after leaving Atmo. Sensitive business information like Atmo's capitalization table and salary and benefits details had no connection to Mr. Mashita's role as a software engineering consultant but make very clear that Mr. Mashita was mining Atmo for documents related to all aspects of the business—technical, business, sales cycles, company organization and shareholders, and employee compensation. Indeed, Aeolus went on to hire one of the employees whose offer letters Mr. Mashita viewed at the end of his consultancy, and Aeolus began meeting with and developing proposals for two key Atmo customers.

Gibson, Dunn &
Crutcher LLP

78.    Finally, Mr. Mashita, by his own admission, retained a copy of AtmoDeck, which contains a portion of Atmo's source code and forms a part of its current system architecture.  Only six months later, Mr. Mashita and Aeolus were claiming to have a viable, competitive offering.  But developing a competitive offering in this industry requires years of trial and error and millions of dollars of investment.  As described above, Atmo has painstakingly worked since 2019 to develop a system that can ingest massive quantities of data, train and test an AI model, and deploy that model into production.  In particular, Atmo developed its sophisticated "Regional Model," which is actually the combination of multiple AI models responsible for handling global weather phenomena, local weather phenomena, and the intersection of the two.  Atmo particularly developed a version of this system that was tailored to the unique needs of Customer B.  To the best of Atmo's knowledge and belief, it would not be possible for Aeolus to independently develop their own system that was competitive enough to pitch to Customer B without using the Atmo confidential and trade secret information Mr. Mashita accessed and retained.

79.    Mr. Mashita and Aeolus's misappropriation imminently threatens Atmo's relationship with its existing and prospective customers, including Customer A and Customer B.  In addition to direct revenue, Atmo receives valuable data and feedback from its customers, and losing these relationships would irreversibly delay Atmo's ability to develop and improve its products.  Moreover, due to customer stickiness in rapidly emerging fields like AI weather forecasting, Atmo may never be able to recover these relationships if they are lost.

80.    Furthermore, by passing Atmo's technology off as their own, Mr. Mashita and Aeolus also threaten to irreparably damage Atmo's hard-earned reputation as a pioneer in the AI weather industry.

81.    The potential loss of customers and reputational damage caused by Mr. Mashita and Aeolus's misappropriation threatens Atmo's investor relationships, fundraising capabilities, and employee morale, imperiling its ability to conduct research and development and risking permanently setting it behind in the race to develop AI weather simulation models.

82.    Mr. Mashita and Aeolus's use of Atmo's proprietary and trade secret information for future expected additional pitches, proposals, and product development activities threatens imminent

and irreversible disclosure and further misappropriation of Atmo's trade secrets and confidential information.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Federal Trade Secret Misappropriation**
**Under the Defend Trade Secrets Act (against all Defendants)**
**18 U.S.C. § 1836, *et seq.***

83.    Each of the foregoing paragraphs is incorporated into this First Cause of Action, as if set forth herein.

84.    As discussed above, Mr. Mashita had access to and obtained possession of a significant amount of Atmo's business and technical trade secrets through his roles as an intern and subsequently a consultant tasked with working on Atmo's proprietary source code and other technical projects.

85.    Mr. Mashita improperly accessed over 50 documents and folders and improperly retained over 200 documents.

86.    Mr. Mashita misappropriated Atmo's trade secrets when he accessed and downloaded at least, for example, Atmo's "Task 1 Deliverable – [Customer A] Requirements Document," "Customer Success / Programs Weekly.pptx," and "Atmo Deck" after leaving Atmo.  Mr. Mashita's misappropriation was done in connection with and for the benefit of Aeolus Labs.

87.    Both Mr. Mashita and Aeolus misappropriated Atmo's trade secrets when, on information and belief, they used these documents to pitch to Customer A and Customer B, and to obtain a head-start in developing Aeolus's solutions and products.

88.    On information and belief, Mr. Mashita still has improper access to Atmo's trade secrets to this date.

89.    On information and belief, if Mr. Mashita is not enjoined, he will continue to access, use, disclose, or otherwise misappropriate Atmo's trade secrets to benefit himself and Aeolus and to unlawfully compete with Atmo.

90.    On information and belief, Defendants' misappropriation of Atmo's trade secrets has caused and continues to cause substantial injury to Atmo's business and reputation, including, but not limited to, actual damages, lost profits, harm to its reputation, and diminution of the value of its trade

secrets.  On information and belief, Defendants have been unjustly enriched by their misappropriation of Atmo's trade secrets.

91.    The Atmo trade secrets misappropriated by Defendants were compiled after many years of hard work and significant financial investment.  They derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.  For example, the "Customer Success / Programs Weekly.pptx" document names Atmo's key customers and describes the product completion cycle for those customers based on extensive negotiation with leaders and scientific stakeholders from Atmo's largest customers. Similarly, the "Task 1 Deliverable – [Customer A] Requirements Document" recites Atmo's plan to develop, train, test, and deploy a weather simulation model for Customer A that is capable of high-speed forecasting of particle dispersion, including specifics of the location and parameters of that model.  And AtmoDeck is part of the foundation for Atmo's current code base, including many techniques for AI programs, algorithms, and model architectures for weather and atmospheric simulation that are still used by Atmo today.  It reveals components of system architecture and processes that Atmo uses today.  Any of these documents would give a significant head start to a potential competitor.

92.    Atmo has taken reasonable efforts to preserve the confidentiality of its Trade Secret Information.  Those measures include confidentiality agreements, NDAs, consulting agreements, the practice of keeping its source-code accessible to a handful of individuals, and other measures outlined above at Paragraphs 23–33.

93.    Atmo therefore seeks preliminary and permanent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to protect the secrecy of its trade secret documents and information and to remedy injury to Atmo's business interests and reputation.  Atmo will continue to suffer irreparable harm absent the requested injunctive relief.

94.    Atmo also seeks an award of actual damages in an amount to be proven at trial under 18 U.S.C. § 1836(b)(3)(B).

95.    On information and belief, Defendants misappropriated Atmo's Trade Secret Information for an improper purpose and in a willful and malicious manner.  Atmo therefore seeks

exemplary damages up to two times the award of actual damages under 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

## SECOND CAUSE OF ACTION
### State Trade Secret Misappropriation
### Under the California Uniform Trade Secrets Act (against all Defendants)
### Cal. Civ. Code §§ 3426, *et seq.*

96.     Each of the foregoing paragraphs is incorporated into this Second Cause of Action, as if set forth herein.

97.     The confidential and proprietary information taken by Defendants includes Atmo's trade secrets as defined in Cal. Civ. Code § 3426.1(d).

98.     As discussed above, Mr. Mashita had access to and obtained possession of a significant amount of Atmo's business and technical trade secrets through his roles as an intern and subsequently a consultant tasked with working on Atmo's proprietary source code and other technical projects.

99.     Mr. Mashita misappropriated Atmo's trade secrets when he accessed and downloaded at least, for example, Atmo's "Task 1 Deliverable – [Customer A] Requirements Document," "Customer Success / Programs Weekly.pptx," and "Atmo Deck" after leaving Atmo.  Mr. Mashita's misappropriation was done in connection with and for the benefit of Aeolus.

100.    Both Mr. Mashita and Aeolus misappropriated Atmo's trade secrets when, on information and belief, they used these documents to pitch to Customer A and Customer B, and to obtain a head-start in developing Aeolus's solutions and products.

101.    On information and belief, Mr. Mashita still has improper access to Atmo's trade secrets to this date.

102.    On information and belief, if Mr. Mashita is not enjoined, he will continue to access, use, disclose, or otherwise misappropriate Atmo's trade secrets to benefit himself and Aeolus and to unlawfully compete with Atmo.

103.    On information and belief, Defendants' misappropriation of Atmo's trade secrets has caused and continues to cause substantial injury to Atmo's business and reputation, including, but not limited to, actual damages, lost profits, harm to its reputation, and diminution of the value of its trade

Gibson, Dunn &
Crutcher LLP

secrets.  On information and belief, Defendants have been unjustly enriched by their misappropriation of Atmo's trade secrets.

104.    The Atmo trade secrets misappropriated by Defendants were compiled after many years of hard work and significant financial investment.  They derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.  For example, the "Customer Success / Programs Weekly.pptx" document names Atmo's key customers and describes the product completion cycle for those customers based on extensive negotiation with leaders and scientific stakeholders from Atmo's largest customers.  Similarly, the "Task 1 Deliverable – [Customer A] Requirements Document" recites Atmo's plan to develop, train, test, and deploy a weather simulation model for Customer A that is capable of high-speed forecasting of particle dispersion, including specifics of the location and parameters of that model.  And AtmoDeck is part of the foundation for Atmo's current code base, including many techniques for AI programs, algorithms, and model architectures for weather and atmospheric simulation that are still used by Atmo today.  It reveals components of system architecture and processes that Atmo uses today.  Any of these documents would give a significant head start to a potential competitor.

105.    Atmo has taken reasonable efforts to preserve the confidentiality of its Trade Secret Information.  Those measures include confidentiality agreements, NDAs, consulting agreements, the practice of keeping its source-code accessible to a handful of individuals, and other measures outlined above at Paragraphs 23–33.

106.    Atmo therefore seeks preliminary and permanent injunctive relief pursuant to Cal. Civ. Code § 3426.2 to protect the secrecy of its trade secret documents and information and to remedy injury to Atmo's business interests and reputation.  Atmo will continue to suffer irreparable harm absent the requested injunctive relief.

107.    Atmo also seeks an award of actual damages in an amount to be proven at trial under Cal. Civ. Code § 3426.3.

108.    On information and belief, Defendants misappropriated Atmo's Trade Secret Information for an improper purpose and in a willful and malicious manner.  Atmo therefore seeks

exemplary damages up to two times the award of actual damages under Cal. Civ. Code § 3426.3 and attorneys' fees under Cal. Civ. Code § 3426.4.

### THIRD CAUSE OF ACTION
**Breach of Contract (against Mr. Mashita)**

109.    Each of the foregoing paragraphs is incorporated into this Third Cause of Action, as if set forth herein.

110.    Mr. Mashita breached his contracts and agreements with Atmo, including the Mutual Non-Disclosure Agreement, the Consulting Agreement, and the Consulting Agreement and Confidential Information and Invention Assignment Agreement.  Specifically, Mr. Mashita breached his agreements with Atmo by failing to return or destroy Atmo confidential information after the conclusion of his employment with Atmo and instead continuing to access and download Atmo confidential information after he ceased being a consultant for Atmo.  Mr. Mashita additionally breached his agreements with Atmo by, on information and belief, using Atmo confidential information to develop a company intended to compete with Atmo.  Mr. Mashita additionally breached his agreements with Atmo by, on information and belief, failing to disclose to Atmo the meteorology and weather modification IP that underlies Aeolus Labs and which, on information and belief, Mr. Mashita developed either during the period of, or otherwise in connection with, his employment with Atmo. On information and belief, Mr. Mashita further breached his agreements with Atmo by failing to disclose to Aeolus, its investors, and potential customers, *inter alia*, his contractual obligations to Atmo.

111.    Atmo has performed all of its duties under all such contracts.

112.    Atmo has been injured and will continue to be injured by Mr. Mashita's breaches of his agreements with Atmo in an amount which cannot readily be ascertained or compensated by money damages.

113.    As a direct and proximate result of Mr. Mashita's breach of his contracts, Atmo has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, Atmo is entitled to preliminary injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Atmo, Inc. prays for judgment in its favor and against Defendants Koki Mashita and Aeolus Labs, as follows:

A.  For preliminary and permanent injunctive relief against Defendants, including enjoining Mr. Mashita from violating his legal and contractual duties to Atmo, enjoining Defendants from accessing, using, disclosing, or otherwise misappropriating Atmo's confidential and trade secret documents and information, and directing Defendants to return all of Atmo's confidential and trade secret documents and information in their possession, custody, or control;

B.  For an order assigning any intellectual property jointly or solely authored, discovered, developed, conceived, or reduced to practice by Mr. Mashita during his consultancy or in connection with his consultancy for Atmo.

C.  For damages, including exemplary damages, as described above in each of the above causes of action;

D.  For costs, attorneys' fees, and other expenses incurred in this action;

E.  For pre-judgment and post-judgment interest; and

F.  For such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Atmo respectfully requests a jury trial on all claims for relief.


Respectfully submitted,

Dated:  July 3, 2025                    GIBSON, DUNN & CRUTCHER LLP


*/s/ L. Kieran Kieckhefer*
L. Kieran Kieckhefer

*Counsel for Plaintiff Atmo, Inc.*