# EXHIBIT A

## ATMO, INC.

## CONSULTING AGREEMENT

This Consulting Agreement (this "Agreement") is made effective as of June 26, 2024 (the "Effective Date"), by and between Atmo, Inc., a Delaware corporation (the "Company"), and Milan Curcic, an individual ("Consultant").

1. **Consulting Services**.

    (a) **Services**. During the term of this Agreement, Consultant will provide consulting services to the Company as described on Exhibit A hereto, as well as any other services mutually agreed to by the parties hereto from time to time (the "Services"). Consultant represents that Consultant is duly licensed (as applicable) and has the qualifications, the experience and the ability to properly perform the Services. Consultant shall use Consultant's best efforts to perform the Services such that the results are satisfactory to the Company.

    (b) **Past and Future Activities**. This Agreement applies to Consultant's consulting relationship with the Company. For purposes of clarity, if (i) Consultant performed work, activities, or services, or otherwise made efforts, on behalf of the Company or for its benefit, or in anticipation of Consultant's involvement with the Company that would have been within the scope of Consultant's consulting relationship if performed during the term of this Agreement or (ii) within one (1) year after Consultant's consulting relationship with the Company ends Consultant becomes reengaged by the Company, then, unless the Company and Consultant otherwise agree in writing, this Agreement shall apply to all such past and future work, activities, services, and efforts. The "Relationship" refers to Consultant's consulting relationship with the Company, whether commenced before, on, or after the Effective Date.

2. **Fees**. As consideration for the Services to be provided by Consultant and other obligations, the Company shall pay to Consultant the amounts specified in Exhibit B hereto at the times specified therein ("Fees").

3. **Expenses**. Consultant shall not be authorized to incur on behalf of the Company any expenses and will be responsible for all expenses incurred while performing the Services unless otherwise agreed to by the Company's Chief Executive Officer. If approved, as a condition to receipt of reimbursement, Consultant shall be required to submit to the Company reasonable evidence that the amount involved was both reasonable and necessary to the Services provided under this Agreement.

4. **Term and Termination**.

    (a) **Term**. Consultant shall serve as a consultant to the Company for a period commencing on the Effective Date and, unless earlier terminated as provided for herein, terminating the date Consultant completes the Services to the Company's satisfaction hereunder or (ii) the date Consultant has been paid the maximum amount of Fees specified in Exhibit B hereto.

    (b) **Termination for Convenience**. Either party may terminate this

Agreement at any time upon ten (10) days' prior written (or email) notice. In the event of such termination, Consultant shall be paid for any portion of the Services that have been performed prior to the termination.

(c) **Termination for Cause**. Should either party default in the performance of this Agreement or materially breach any of its obligations under this Agreement between the Company and Consultant, the non-breaching party may terminate this Agreement immediately if the breaching party fails to cure the breach within [five (5) days] after having received written notice by the non-breaching party of the breach or default.

(d) **Survival**. Sections 4(d), 5, 7, 8, 9, 10, 11, and 15 through 19 shall survive termination or expiration of this Agreement.

5. **Independent Contractor**. Consultant's relationship with the Company will be that of an independent contractor and not that of an employee.

(a) **Method of Provision of Services**. Consultant shall have sole direction, control and responsibility for determining the method, details and means of performing the Services. The Company shall not control any manner, method, details, or means by which Consultant performs the Services. Consultant shall not be permitted to assign, delegate, or subcontract all or any part of the Services to any other person without the prior written authorization of the Company. If Consultant engages any other person to provide all or any part of the Services, regardless of whether the Company provides such authorization, Consultant shall be fully responsible for each such person's performance of, or failure to perform, the Services. Such persons are not and shall not be employees of the Company, and Consultant shall expressly advise such persons of the terms of this Agreement and shall require each such person to execute and deliver to the Company a confidential information and invention assignment agreement containing terms that are at least as protective of the Company as the terms of this Agreement. The Company and Consultant acknowledge and agree that the Services are outside the usual course of business of the Company. Consultant warrants that Consultant is customarily engaged in an independently established trade or occupation, and/or has an independently established business, and through such ventures Consultant operates as an independent contractor that provides services (similar to the Services provided under this Agreement) to other clients.

(b) **No Authority to Bind the Company**. Consultant acknowledges and agrees that Consultant has no authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company.

(c) **No Benefits**. Consultant acknowledges and agrees that Consultant shall not be eligible for any employee benefits offered by the Company and, to the extent Consultant otherwise would be eligible for any such employee benefits but for the express terms of this Agreement, Consultant hereby expressly declines to participate in such employee benefits.

(d) **Taxes; Indemnification**. Consultant shall have full responsibility for applicable taxes for all compensation paid to Consultant under this Agreement, including any withholding requirements that apply to any such taxes, and for compliance with all applicable labor and employment requirements with respect to Consultant's self-employment, sole

proprietorship or other form of business organization and any U.S. immigration visa requirements.  Consultant agrees to indemnify, defend and hold the Company harmless from any liability for, or assessment of, any claims or penalties or interest with respect to such taxes, labor or employment requirements, including any liability for, or assessment of, taxes imposed on the Company by the relevant taxing authorities with respect to any compensation paid to Consultant or any liability related to the withholding of such taxes.

6.      **Supervision of Consultant's Services**.  The Company shall not supervise Consultant in the performance of the Services. All of the Services will be as agreed between Consultant and a duly authorized representative of the Company.  Consultant will be required to report to such individual, or another duly authorized representative designated by the Company, concerning the Services performed under this Agreement.  The nature and frequency of these reports will be left to the discretion of the Company.

7.      **Confidentiality**.

(a)      **Confidential Information Definition**. "Confidential Information" means any and all information and physical manifestations thereof not generally known or available outside the Company and information and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable, and without regard to whether such information and physical manifestations thereof are marked or otherwise designated as "confidential", "proprietary", or something similar.  Confidential Information includes, without limitation:  (i) Company IP (as defined below); (ii) IP owned or licensed by the Company prior to or outside of this Agreement; (iii) Company Data (as defined below) that Consultant receives, accesses or uses in connection with the Relationship; (iv) access credentials, such as username, password, security key, security token, or PIN; (v) lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants); and (vi) lists of, agreements with, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom Consultant called or with whom Consultant became acquainted during the Relationship) and any other third parties, price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to Consultant by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.  Notwithstanding the foregoing, Confidential Information does <u>not</u> include information that is generally available to and known by the public through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

(b)      **Protection of Information**.  Consultant understands that during the Relationship, the Company intends to provide Consultant with certain information, including Confidential Information, without which Consultant would not be able to perform Consultant's duties to or for the Company.  At all times during the Relationship and thereafter, Consultant shall hold any and all Confidential Information that Consultant obtains, accesses, or creates during the Relationship in strictest confidence, shall not use such Confidential Information except for the Company's benefit and to the extent necessary to perform Consultant's obligations to the Company in connection with the Relationship, and shall not disclose such Confidential

Information to any third party without written authorization from the Company in each instance. Consultant shall comply with the foregoing obligations whether or not during working hours, until the information at issue is no longer Confidential Information as described herein. Consultant will not make copies of any Confidential Information (including any documents, records, files, media, or other resources containing any Confidential Information) except as authorized by the Company or in the ordinary course of Consultant's obligations to the Company in connection with the Relationship. Consultant shall not use Confidential Information in violation of any applicable laws.

(c) **Third Party Information**. During the Relationship and thereafter, Consultant will not improperly use or disclose to the Company any confidential, proprietary or secret information of Consultant's former employer(s) or any other person, and Consultant will not bring any such information onto the Company's property or place of business or upload or transfer any such information to the Company's property, devices, or cloud services accounts.

(d) **Other Rights**. This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

(e) **Permitted Disclosures**. Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. To the extent legally permissible, Consultant shall promptly provide reasonable advance written notice of any such order to an authorized officer of the Company. Without limiting the generality of the foregoing:

(i) Nothing in this Agreement prohibits or restricts Consultant (or Consultant's attorney) from communicating with the Securities and Exchange Commission, the Financial Industry Regulatory Authority, or any other applicable regulatory authority regarding a possible securities law violation.

(ii) Nothing in this Agreement prohibits or restricts Consultant from exercising protected rights, including without limitation those rights granted under Section 7 of the National Labor Relations Act, or otherwise disclosing information as permitted by applicable law, regulation, or order.

(iii) The U.S. Defend Trade Secrets Act of 2016 ("<u>DTSA</u>") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and solely for the purpose of reporting or investigating a suspected violation of law; or (B) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (x) files any document containing the trade secret under seal; and (y) does not disclose the trade secret, except pursuant

to court order.

8. **IP Matters**.

(a) **IP Definitions**.

(i) "IP" means any and all: (A) processes, machines, manufactures, compositions of matter, and other potentially patentable subject matter of any kind, as well as discoveries, ideas, inventions (whether or not reduced to practice), algorithms, calculations, methods, techniques, technology, equipment, tools, devices, apparatuses, systems, compounds, formulations, designs, and configurations; (B) written, photographic, audio, video, audiovisual, or other content of any kind (in whatever form embodied), including without limitation software (in whatever form embodied, including source and executable code), content, textual or artistic works, videos, graphics, sound recordings, mask works, manuals, documentation, communications, specifications, memoranda, communications, records, laboratory notebooks, flowcharts, presentations, notes, reports, lists, and other works of authorship and other potentially copyrightable subject matter of any kind; (C) trade names, trade dress, slogans, logos, trademarks, service marks, and other source identifiers and other trademarkable subject matter of any kind; (D) trade secrets (including those trade secrets defined under any applicable laws, including without limitation the Uniform Trade Secrets Act and DTSA), business, technical and know-how data and information, non-public information, and confidential information, including all know how, processes, customer, client, and personnel lists or data, business and marketing plans, and marketing information and rights to limit the use or disclosure thereof by any person; (E) data, databases, and data collections of any kind; and (F) any enhancements, improvements, derivatives, or modifications of any kind of any of the foregoing; in each case with respect to subsections (A) through (F) whether or not any of the foregoing is patentable, copyrightable, trademarkable, or otherwise legally protectable.

(ii) "IP Rights" means any and all intellectual property, industrial, or other proprietary rights of any kind, throughout the world, in IP, including without limitation any and all: (A) patent rights and any equivalent or similar rights in or relating to patentable subject matter, such as utility models and industrial rights; (B) copyrights and all other rights corresponding thereto, and any equivalent or similar rights in copyrightable works of authorship, semiconductor masks, layouts, architectures or topology, moral and economic rights of authors and inventors, however denominated and any similar or equivalent rights in or relating to any of the foregoing; (C) rights in or relating to trademarks of any kind and character and goodwill associated with and symbolized by such trademarks; (D) rights in or relating to trade secrets, confidential and proprietary information and know-how, and industrial designs; (E) rights in or relating to data or databases; and (F) rights in or relating to applications and registrations for, all related rights of priority with respect to, and renewals, combinations, divisions, reissues, continuations, or extensions of, any of the rights referred to in subsections (A) through (E) above.

(iii) "Company IP" means, other than Excluded IP: (A) IP that Consultant solely or jointly authors, discovers, develops, conceives, or reduces to practice in connection with, or as a result of, the Services, or otherwise in connection with the Relationship or that includes, incorporates, or otherwise relies upon the use of or results from access to, any

Confidential Information; (B) any other work product, deliverables, materials, compilations, analyses or information that Consultant solely or jointly authors, discovers, develops, conceives, or reduces to practice in connection with, or otherwise, or as a result of, the Services, or otherwise in connection with the Relationship, including without limitation Company Data (as defined below); and (C) all IP Rights in any of the foregoing.

(iv) "Consultant Background IP" means IP that, as of the Effective Date: (A) has been created by Consultant or on Consultant's behalf; (B) (x) is owned exclusively by Consultant or jointly by Consultant with others or (y) in which Consultant otherwise has an ownership interest; (C) relates in any way to any of the Company's actual or proposed businesses, products, services, or research and development; and (D) which is not intended to be assigned to the Company hereunder.

(v) "Excluded IP" means IP that Consultant solely or jointly authors, discovers, develops, conceives, or reduces to practice: (A) outside of the Relationship and not in connection with or as a result of the Services; (B) on Consultant's own time without using the Company's equipment, supplies, facilities, or Confidential Information; and (C) that do not relate at the time of authorship, discovery, development, conception, or reduction to practice to the Company's business or actual or demonstrably anticipated research or development.

(vi) "Moral Rights" means all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like.

(b) **Consultant Background IP Disclosure**. Consultant has attached hereto, as Exhibit C, a complete list describing with particularity all of Consultant's Consultant Background IP. Consultant understands that Consultant's listing of any IP on Exhibit C does not constitute an acknowledgement by the Company of the existence or extent of such IP, nor of Consultant's ownership of such IP.

(c) **Use or Incorporation of Consultant Background IP and Excluded IP**. If in the course of the Relationship Consultant uses or incorporates into any of the Company's products, services, processes, or machines, or creates in any Company IP any dependency on, any Consultant Background IP or Excluded IP, Consultant will promptly so inform the Company in writing. Whether or not Consultant gives such notice, Consultant hereby grants to the Company a perpetual, irrevocable, fully paid-up, royalty-free, worldwide, fully transferable and sublicensable (through multiple tiers), nonexclusive right and license to practice and exploit such Consultant Background IP and Excluded IP and to make, have made, copy, modify, prepare derivative works of, use, sell, import, and otherwise distribute and commercialize the product, service, process, machine, or Company IP in which it was used or incorporated, or with respect to which the Company has a dependency on such Consultant Background IP or Excluded IP.

(d) **Company IP and Excluded IP**.

(i) **Records and Disclosure**. Consultant shall keep and maintain adequate and current written records of all IP made or conceived by Consultant (solely or jointly with others) during the Relationship, which such records shall be considered Company IP. The

records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. Consultant will make the records available to the Company on request. Consultant will not remove such records from the Company's place of business or systems except as expressly permitted by the Company's policy which may, from time to time, be revised at the Company's sole election. Without limiting the generality of the foregoing, during the Relationship and for a period of twelve (12) months thereafter, Consultant will promptly make full written disclosure to the Company of all IP that Consultant solely or jointly authors, discovers, develops, conceives, or reduces to practice during the period of, or otherwise in connection with, the Relationship for, among other things, the Company to determine which IP is Company IP and which is Excluded IP.

(ii) **Ownership of Company IP**. The Company and Consultant intend for all Company IP to be owned solely and exclusively by the Company. Consultant will hold in trust for the sole right and benefit of the Company, and hereby assigns to the Company, or its designee, for no additional consideration, all of Consultant's right, title and interest (including Moral Rights) in and to any and all Company IP. Consultant further hereby waives and irrevocably quitclaims to the Company or its designee any and all claims, of any nature whatsoever, that Consultant now has or may hereafter have for infringement of any Company IP. If Consultant has any rights to Company IP that cannot be assigned to the Company, Consultant hereby grants to the Company a perpetual, irrevocable, fully paid-up, royalty-free, worldwide, fully transferable and sublicensable (through multiple tiers), exclusive right and license to practice and exploit such rights and to make, have made, copy, modify, prepare derivative works of, use, sell, import, and otherwise distribute and commercialize any of the Company's products or services that may practice such rights. Without limiting the generality of the foregoing, to the extent Consultant has any Moral Rights in Company IP that cannot be assigned under applicable law, Consultant hereby waives and agrees not to enforce any such Moral Rights, including without limitation any limitation on subsequent modification, to the extent permitted under applicable law.

(iii) **Further Assurances; Power of Attorney**. During and after the Relationship, Consultant agrees to reasonably cooperate with the Company, at the Company's expense and within the Company's timeframe, to: (i) apply for, obtain, perfect, and transfer to the Company the Company IP; and (ii) maintain, protect, and enforce the same, including without limitation by executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments requested by the Company. Consultant hereby irrevocably grants the Company a power of attorney to execute and deliver any such documents on Consultant's behalf in Consultant's name and to do all other lawfully permitted acts to transfer the Company IP to the Company and further the transfer, issuance, prosecution, and maintenance of all IP Rights therein, to the fullest extent permitted by law, if Consultant does not promptly cooperate with the Company's requests (and without limiting any other rights or remedies the Company may have in such circumstances). The foregoing power of attorney is coupled with an interest and shall not be affected by Consultant's subsequent incapacity.

(e) **Publicity**. Consultant hereby consents to any and all uses and displays by the Company and its agents of Consultant's name, voice, likeness, image, appearance, and biographical information in any media, at any time during or after the Relationship, for all

-7-

legitimate business purposes of the Company. Consultant hereby forever releases the Company and its directors, officers, employees, and agents from and against any and all claims, actions, damages, losses, costs, expenses, and liabilities of any kind, arising under any legal or equitable theory whatsoever, relating to any such permitted use of any of the foregoing.

**9.     Privacy**.

(a)     **Personal Information Definition**. "Personal Information" means information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household.

(b)     **Privacy Notice**. Consultant acknowledges that:

(i)     the Company collects certain Personal Information about Consultant, which may include contact information, identification materials, demographic information, professional information, education and training information, financial information, security credentials, information about Consultant's activity on and use of the Company's facilities and its telecommunications, networking and information processing systems, as well as other work-related information. The Company may collect such information directly from Consultant as well as from supervisors, colleagues, customers, vendors, publicly available sources and other third parties Consultant may interact with as an independent contractor for the Company. In addition, the Company may also collect this information through service providers and other third parties that collect it on the Company's behalf, such as communications providers and payroll providers; and

(ii)     the Company uses Consultant's Personal Information in the ordinary course of business for purposes such as: onboarding, staffing, performance management, training, discipline; supporting and managing personnel; managing access to or use of company systems, facilities, records, property and infrastructure; monitoring personnel conduct and compliance with the Company's policies and practices; improving efficiency; compensation planning and administration; managing business travel; communicating with and between personnel, as well as with designated emergency contacts; investigating, documenting and reporting work-related injuries, illnesses, or grievances; conducting other work-related investigations, audits, and risk assessments; fulfilling contractual obligations to personnel and third parties; and complying with applicable laws.

**10.     Company Property**.

(a)     **Company Equipment; Returning Company Documents**. Consultant acknowledges that they have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, email messages, and voice messages) and that Consultant's activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice. Consultant further acknowledges that any property situated on the Company's premises or systems and owned by the Company, including storage media, filing cabinets or other work areas, is subject to inspection by the Company at any time with or without notice. At the time of termination of the Relationship, Consultant will deliver to the Company (and will not keep in

Consultant's possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by Consultant pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

(b) **Company Data**. Consultant acknowledges that in the course of the Relationship Consultant may collect, receive, access, or use Personal Information and/or other Confidential Information, relating to the Company's customers, potential customers, end-users, suppliers, potential suppliers, employees, independent contractors, and other personnel, or others (collectively, "Company Data"). As between the Company and Consultant, the Company owns all right, title and interest in and to all Company Data. Consultant agrees to collect, receive, access, use, retain and disclose Company Data (i) in compliance with all applicable laws and (ii) solely for the purpose of performing the Services and for no other commercial purpose. Consultant shall not collect, receive, access, use, retain or disclose Company Data outside of Consultant's direct business relationship with the Company, and shall not combine Company Data with any other information that Consultant receives from or on behalf of another person or business unless specifically requested by the Company. Consultant shall not sell or disclose Company Data to any third party without the Company's prior written consent unless required by applicable law. Consultant acknowledges that Company Data may be subject to protection by federal, state or international privacy laws or contractual restrictions on use, and Consultant agrees to adhere to any policies, procedures and instructions that the Company has implemented to protect the privacy and security of Company Data. Consultant hereby permits the Company to monitor Consultant's compliance with such policies, procedures and instructions using manual reviews, automated scans and/or regular assessments, audits or other technical and operational testing, as reasonably required. Consultant further agrees to delete and permanently destroy the Company Data promptly (i) upon request by the Company, and (ii) upon termination of the Relationship.

11. **Non-Solicit**.

(a) **Generally**. As described above, Consultant acknowledges that the Company's Confidential Information includes information relating to the Company's customers, potential customers, end-users, suppliers, potential suppliers, employees, independent contractors, and other personnel, and others, and Consultant will not use or disclose such Confidential Information except as authorized by the Company in advance in writing. Consultant further agrees as follows:

(i) **Employees, and Independent Contractors**. During the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason (the "Restriction Period"), whether with or without cause, Consultant shall not, directly or indirectly, solicit any of the Company's employees or independent contractors to terminate their relationship with the Company, either for Consultant or for any other person or entity.

(ii) **Other Parties**. During the Relationship, Consultant will not influence any of the Company's actual or potential customers from purchasing the Company's

-9-

products or services or solicit or influence or attempt to influence any actual or potential customer either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.[1]

    (b) **Notice to Third Parties**. During the Restriction Period, Consultant shall inform any entity or person with whom Consultant may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of Consultant's contractual obligations under this Agreement. Consultant acknowledges that the Company may, with or without prior notice to Consultant and whether during or after the Relationship, notify third parties of Consultant's agreements and obligations under this Agreement. To the fullest extent permissible under applicable law, upon written request by the Company, Consultant will respond to the Company in writing regarding the status of Consultant's consulting relationship or proposed consulting relationship with any party during the Restriction Period.

   12. **Company Policies**. As a condition of Consultant's Relationship with Company, Consultant must become familiar with all policies of the Company applicable to Consultant, including without limitation the Company's policies regarding the prohibition and prevention of harassment in the Company's workplace and with respect to the Company's personnel, as such policies are changed from time to time, and must comply with all such policies, and in each case Consultant agree that they will do so.

   13. **Consulting or Other Services for Competitors**. Consultant represents and warrants that Consultant does not presently perform or intend to perform, during the term of the Agreement, consulting or other services for, or engage in or intend to engage in an employment relationship with, companies whose businesses or proposed businesses in any way involve products or services which would be competitive with the Company's products or services, or those products or services proposed or in development by the Company during the term of the Agreement (except for those companies, if any, listed on <u>Exhibit D</u> hereto). If, however, Consultant decides to do so, Consultant agrees that, in advance of accepting such work, Consultant will promptly notify the Company in writing or in email, specifying the organization with which Consultant proposes to consult, provide services, or become employed by and to provide information sufficient to allow the Company to determine if such work would conflict with the terms of this Agreement, the interests of the Company or further services which the Company might request of Consultant. If the Company determines that such work conflicts with the terms of this Agreement, notwithstanding Section 4, the Company reserves the right to terminate this Agreement immediately. In no event shall any of the Services be performed for the Company at the facilities of a third party or using the resources of a third party.

   14. **Conflicts with this Agreement**. Consultant represents and warrants that: (a) it is not under any pre-existing obligation in conflict or in any way inconsistent with the provisions of this Agreement; (b) its performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Consultant in confidence or in trust prior to commencement of this Agreement; and (c) it has the right to disclose and/or or use all ideas, processes, techniques and other information, if any, which Consultant has gained from third parties, and which Consultant discloses to the Company or uses in the course of

---

[1]

-10-

performance of this Agreement, without liability to such third parties.

15. **Additional Representations and Warranties**. Consultant represents, warrants, and covenants to the Company that: (a) it shall perform the Services using personnel of required skill, experience, and qualifications and in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and shall devote adequate resources to meet its obligations under this Agreement; (b) it is in compliance with, and shall perform the Services in compliance with, all applicable laws rules, and regulations; (c) it has and maintains appropriate security measures to comply with its obligations under this Agreement; (d) the Company will receive good and valid title to all results of the Services (including any Company IP); (e) it will not, and none of the Services or results thereof (including any Company IP) or the Company's use thereof do or will infringe any third party's intellectual property or other proprietary rights; (f) it will not incorporate into any results of the Services (including any Company IP) any third party materials without the Company's prior written approval and in any event Consultant will comply with all requirements of any terms and conditions applicable to such third party materials; and (g) the Services and all results thereof (including any Company IP) will conform with all requirements or specifications stated in this Agreement or as identified by the Company.

16. **Indemnification**. Consultant shall indemnify and hold harmless the Company and its affiliates and their respective directors, officers, personnel, successors, and assigns from and against all losses, liabilities, taxes, damages, costs, and expenses (including attorneys' fees and other legal expenses) arising from, in connection with, or otherwise relating to: (a) the negligence or more culpable acts or omissions (including gross negligence, fraud, and willful misconduct) of Consultant or any person performing all or any part of the Services on Consultant's behalf; (b) breach of the Agreement by Consultant or any person performing all or any part of the Services on Consultant's behalf; (c) any failure of Consultant or any person performing all or any part of the Services on Consultant's behalf to perform the Services in accordance with all applicable laws, rules, and regulations; or (d) any actual or alleged violation of a third party's rights resulting in whole or in part from the Company's use of the results of the Services performed under this Agreement (including any Company IP).

17. **Limitation of Liability**. IN NO EVENT SHALL COMPANY BE LIABLE TO CONSULTANT OR TO ANY OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER COMPANY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. IN NO EVENT SHALL COMPANY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY COMPANY TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR COMPANY IP GIVING RISE TO SUCH LIABILITY.

18. **Arbitration Agreement**. Consultant and the Company agree that, to the fullest extent permitted by applicable law, any and all claims or disputes relating to, arising from or

regarding the parties' relationship, Consultant's Services or this Agreement shall be resolved by final and binding arbitration, including claims against the Company's current or former employees, officers, directors or agents. The arbitrator shall determine arbitrability of claims (except as to the Class Waiver). Consultant and the Company agree to bring any claim in arbitration before a single JAMS arbitrator pursuant to the applicable JAMS rules as agreed by the parties or determined by the arbitrator. *See* https://www.jamsadr.com/adr-rules-procedures/. Consultant and the Company further agree that such claims shall be resolved on an individual basis only, and not on a class, collective, representative, or private attorney general act representative basis on behalf of others ("Class Waiver"), to the fullest extent permitted by applicable law. Any claim that all or part of the Class Waiver is invalid, unenforceable, unconscionable, or void may be determined only by a court of competent jurisdiction. In no case may class, collective or representative claims proceed in arbitration. **Consultant and the Company waive any rights to a jury trial or a bench trial in connection with the resolution of any claim under this arbitration agreement** (although either party may seek interim emergency relief from a court to prevent irreparable harm to their confidential information or trade secrets pending the conclusion of any arbitration). Claims will be governed by applicable statutes of limitations. This arbitration agreement shall be construed and interpreted in accordance with the Federal Arbitration Act. In the event that any portion of this arbitration agreement is deemed illegal or unenforceable, such provision shall be severed and the remainder of the arbitration agreement shall be given full force and effect.

19. **Miscellaneous**.

(a) **Governing Law**. Except as to the arbitration agreement above, the validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of California, without giving effect to principles of conflicts of law.

(b) **Entire Agreement**. This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c) **Amendments and Waivers**. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d) **Successors and Assigns**. Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. Consultant may not assign, whether voluntarily or by operation of law, any of Consultant's rights and obligations under this Agreement, except with the prior written consent of the Company.

(e)     **Notices**.  Notices and all other communications contemplated by this Agreement shall be in writing and shall be deemed to have been duly given when: (i) personally delivered or (ii) when mailed by U.S. registered or certified mail or recognized overnight courier, return receipt requested and postage prepaid.  The Company may also provide Consultant notice via email at the email address that Consultant most recently communicated to the Company in writing, which such notice shall be deemed to have been duly given when sent.  All notices must be addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.  In any case, a copy of any notice sent to the Company must be sent via email to johan@atmo.ai.

(f)     **Severability**. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g)     **Construction**. This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h)     **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution via an electronic signature system, facsimile copy or scanned image will have the same force and effect as execution of an original, and an electronic signature, facsimile or scanned image signature will be deemed an original and valid signature.

(i)     **Electronic Delivery**.  The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Consultant hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

The parties have executed this Consulting Agreement on the respective dates set forth below to be effective as of the Effective Date.

THE COMPANY:

ATMO, INC.

By: _____
              (Signature)

-13-

Name: Alexander Levy

Title: Founder, CEO

Address: 1266 Harrison St,

San Francisco, CA 94103

United States

Date: 8/7/2024

**CONSULTANT:**

Koki Mashita

(Print Name)

*[Signature: DocuSigned by 26D14D36233B4A5...]*

(Signature)

Address: 4533-277 Nagakura Karuizawa-town, Nagano, Japan 3890111

Email: koki@mashita.org

Date: 8/8/2024

-14-

## EXHIBIT A

## DESCRIPTION OF CONSULTING SERVICES

SCOPE: WEATHER FORECASTING RESEARCH AND DEVELOPMENT AND OCCASIONAL BUSINESS DEVELOPMENT.

## **EXHIBIT B**

## **COMPENSATION**

For Services rendered by Consultant under this Agreement, the Company shall pay Consultant at the rate of $7500 per month, payable at the approval of Consultant's invoice to the Company. Consultant shall invoice the Company on a monthly basis, for a two month period.

# EXHIBIT C

## LIST OF PRIOR INVENTIONS
## AND ORIGINAL WORKS OF AUTHORSHIP
## EXCLUDED UNDER SECTION 8(B)

The following is a list of my Consultant Background IP (if any):

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| | | |

Except as indicated above on this Exhibit, I have no Consultant Background IP to disclose pursuant to Section 8(b) of this Agreement.

__0__ Additional sheets attached

Signature of Consultant: _[DocuSigned by: /s/ Koki Mashita, 26014D36233B4A5...]_

Print Name of Consultant: Koki Mashita

Date: 8/8/2024

## EXHIBIT D

## LIST OF COMPANIES
## EXCLUDED UNDER SECTION 13

<u>None</u> No conflicts

<u>0</u> Additional Sheets Attached

Signature of Consultant: _[DocuSigned signature]_

Print Name of Consultant: Koki Mashita

Date: 8/8/2024