TYLER NEWBY (CSB No. 205790)
tnewby@fenwick.com
GARNER KROPP (CSB No. 312585)
gkropp@fenwick.com
JULIAN SARABIA (CSB No. 359295)
jsarabia@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300
Facsimile: 415.281.1350

JOAN LIU-KIM (CSB No. 342130)
joanieliu-kim@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500

Attorneys for KOKI MASHITA and AEOLUS LABS, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATMO, INC.,<br><br>Plaintiff,<br><br>v.<br><br>KOKI MASHITA; AEOLUS LABS, INC.,<br><br>Defendants. | Case No.: 4:25-cv-05652-YGR<br><br>**DEFENDANTS' OPPOSITION TO ATMO'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: September 23, 2025<br>Time: 2:00 p.m.<br>Courtroom: 1<br>Judge: Yvonne Gonzalez Rogers<br><br>Trial Date: None set |

# Document Sought To Be Filed Under Seal

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Aeolus Is Developing Weather Modification Technology, Not AI Forecasting. ........ 2

II. Mr. Mashita Worked With Atmo As A Student Volunteer And Intern. ........ 4

III. Mr. Mashita Invests In Atmo. ........ 7

IV. Mr. Mashita And Mr. Lee Created Aeolus Labs. ........ 8

V. Atmo Tried To Intimidate Mashita, Then Ignored His Response. ........ 8

ARGUMENT ........ 10

I. Legal Standard ........ 10

II. Atmo Is Unlikely To Succeed On The Merits Of Its Trade Secret Claims. ........ 11

A. Mr. Mashita Had Permission To Access Files In Atmo's Shared Storage. ........ 11

B. Mr. Mashita Did Not Misappropriate Source Code. ........ 13

C. Defendants Do Not And Will Not Use Atmo's Claimed Trade Secrets, Which Have No Value Outside Atmo. ........ 13

D. Atmo's Claim Of Threatened Misappropriation Is Based On The Rejected Inevitable Disclosure Doctrine. ........ 15

E. Many Of Atmo's Alleged Trade Secrets Are Vague Concepts Or Public. ........ 17

F. Atmo Did Not Use Reasonable Measures To Protect Its Trade Secrets. ........ 19

III. Atmo Is Unlikely To Succeed On The Merits Of Its Breach Of Contract Claim. ........ 20

IV. Atmo Has Not Shown A Threat Of Irreparable Harm. ........ 21

A. Atmo's Lengthy Delay Defeats Any Claim Of Irreparable Harm. ........ 21

B. Atmo Has No Evidence Of Any Actual Or Threatened Harm. ........ 22

FENWICK & WEST LLP
ATTORNEYS AT LAW

V. The Balance Of Hardships To The Parties And The Public Interest Do Not Favor A Preliminary Injunction. .......... 23

VI. The Court Should Disregard Mr. Doricko's Testimony. .......... 24

VII. Atmo Should Post A Bond If The Court Enjoins Defendants. .......... 25

CONCLUSION .......... 25

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014)........ 21

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988)........ 21

*Cypress Semiconductor Corp. Superior Ct.*,
163 Cal. App. 4th 575, 588 (Cal. Ct. App. 2008) ........ 19

*Cypress Semiconductor Corp. v. Maxim Integrated Prods., Inc.*,
236 Cal. App. 4th 243 (2015) ........ 16

*Diversified Silicone Prods. Corp. v. Elastapro Silicone Sheeting LLC*,
No. CV202010PSGPJWX, 2020 WL 4390380 (C.D. Cal. May 19, 2020) ........ 21, 22, 23

*Earth Island Institute v. Carlton*,
626 F.3d 462 (9th Cir. 2010)........ 11

*ELT Sight, Inc. v. EyeLight, Inc.*,
No. LACV1905545JAKRAOX, 2020 WL 7862134 (C.D. Cal. Aug. 28, 2020) ........ 16

*Goldie's Bookstore, Inc. v. Superior Ct.*,
739 F.2d 466, 472 (9th Cir. 1984)........ 21

*Imax Corp. v. Cinema Techs., Inc.*,
152 F.3d 1161 (9th Cir. 1998)........ 17, 18

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020)........ 11

*Kolay v. Milliken*,
No. 2-18-CV-00640 SVW KSX, 2018 WL 1942709 (C.D. Cal. Mar. 22, 2018)........ 22

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
634 F.2d 1197 (9th Cir. 1980)........ 24

*Lydo Enters., Inc. v. City of Las Vegas*,
745 F.2d 1211 (9th Cir. 1984)........ 21

*MAI Sys. Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993)........ 11

*Mattel, Inc. v. MGA Ent., Inc.*,
782 F. Supp.2d 911 (C.D. Cal. 2011)........ 17, 19

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Metro Traffic Control, Inc. v. Shadow Traffic Network*,
22 Cal. App. 4th 853 (1994) .......... 17

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
762 F.2d 1374 (9th Cir. 1985) .......... 21

*Old Republic Ins. Co. v. FSR Brokerage, Inc.*,
80 Cal. App. 4th 666 (Cal. Ct. App. 2000) .......... 20

*Pac. Aerospace & Elecs., Inc. v. Taylor*,
295 F. Supp. 2d 1188 (E.D. Wash. 2003) .......... 23

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) .......... 11

*Symantec Corp. v. McAfree Assocs., Inc.*,
No. C-97-20367 JF EAI, 1998 WL 740798 (N.D. Cal. Jun. 9, 1998) .......... 23

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,
982 F.2d 363 (9th Cir. 1992) .......... 25

*Veliz v. Cintas Corp.*,
No. C 03-1180 SBA, 2004 WL 2452851 (N.D. Cal. Apr. 5, 2004) .......... 23

*Whyte v. Schlage Lock Co.*,
101 Cal. App. 4th 1443 (2002) .......... 16, 17

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*,
10 Cal. App. 5th 56 (Cal. Ct. App. 2017) .......... 20

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008) .......... 11, 24

**STATUTES AND RULES**

18 U.S.C. § 1839(3) .......... 11, 15

Cal. Code Civ. Proc. § 3426.1 .......... 11, 15

Fed. R. Civ. P. 65(c) .......... 25

FENWICK & WEST LLP
ATTORNEYS AT LAW

## INTRODUCTION

Plaintiff Atmo, Inc.'s motion, and indeed its entire case, is premised on the audacious and wrong position that because Defendant Koki Mashita volunteered occasional time as an unpaid volunteer and paid student intern at Atmo, he is forever forbidden from working in any field touching upon weather forecasting. Neither the law nor the facts support this position or the injunction Atmo seeks. Defendant Aeolus Labs, Inc., Mr. Mashita's new weather modification venture, is developing technology to spread aerosols into hurricanes to reduce their devastating forces. It is related to Atmo's AI weather forecasting business only in that they both concern the weather. And even if the businesses had overlapping intellectual property (they do not), none of Aeolus's technology could have come from Atmo because Mr. Mashita is not involved in Aeolus's technical development. Atmo has not shown that either he or Aeolus have or will misappropriate any Atmo trade secrets. Atmo's motion should be denied.

Atmo bases its motion on three sets of facts it claims, falsely, show that when Mr. Mashita was a college sophomore, he masterminded a scheme to steal its trade secrets. First, they argue that during and shortly after his summer internship in 2024, Mr. Mashita accessed scores of Atmo documents that he had no business seeing. But Atmo shared all of these documents with everyone at the company in a common, shared folder. Mr. Mashita's access to them was within the scope of his business development and programming tasks, which required him to understand the company's business and ongoing projects for the company's small number of customers. And at Atmo's request, Mr. Mashita continued helping Atmo's business development into October.

Second, Atmo alleges that Mr. Mashita retained miscellaneous Atmo documents on his personal computer after his paid internship ended and he resumed undergraduate classes. Mr. Mashita used his personal computer because Atmo required him to, and he simply did not think to delete the random assortment of scratch work and files from his computer when his paid internship ended in late August. He continued volunteering for Atmo into the Fall; the company continued to provide him an Atmo email address; and Atmo's CEO, Alexander Levy, continued to email Mr. Mashita's sales leads in Singapore, copying Mr. Mashita. Atmo's concern over these documents is feigned, at best. In November 2024, Mr. Mashita's lawyer told Atmo these

documents were on his computer, identified them by file name, and asked for Atmo's guidance on what to do with them. Atmo never responded. Instead, it lay in wait for seven months until it could strategically style Mr. Mashita's document retention as trade secret misappropriation and breach of contract in an attempt to disrupt fundraising for Mr. Mashita's new company. If Atmo actually thought these documents were sensitive, it would have responded to Mr. Mashita's lawyer's letter in November 2024.

Finally, Atmo alleges Mr. Mashita saved Atmo's core source code, because his lawyer told Atmo in November 2024, that Mr. Mashita had an "Atmo Deck" on his computer. Atmo misidentified that document. It is an Atmo fundraising PowerPoint pitch deck, not source code. Atmo has admitted it has no evidence of Mr. Mashita downloading source code, and he has not.

Mr. Mashita and Aeolus have not misappropriated Atmo's trade secrets or confidential information, and Atmo has not shown a threat that it will be harmed, let alone irreparably harmed. Atmo has not lost any customers. Atmo has not lost any contracts. On the other side, Aeolus has not developed any product and has not won any customers, let alone used Atmo's information to steal them away. The fact that Atmo waited more than seven months before bringing this case is evidence enough of the absence of a threat of irreparable injury. Atmo chose not to bring these claims last year, and the meanwhile, Atmo's fear that Aeolus would usurp Atmo has not materialized. That alone is fatal to Atmo's demand emergency relief now.

## BACKGROUND

### I. Aeolus Is Developing Weather Modification Technology, Not AI Forecasting.

Mr. Mashita and Mason Lee co-founded Aeolus Labs in December 2024, originally as a research endeavor. Declaration of Koki Mashita ¶ 6. Aeolus aims to reduce the harm catastrophic events through weather modification. *Id.* ¶ 2. Weather modification is a field that involves deploying aerosols into clouds from aircraft to change the weather, sometimes referred to as "cloud seeding." Declaration of Dr. Tobias Bischoff ¶ 12.

Aeolus has not used any Atmo trade secret, confidential information, or intellectual property to develop its technology, which is still early stage. Mashita Decl. ¶ 45; Declaration of Mason Lee ¶ 14; Bischoff Decl. ¶ 6. Aeolus is still in research and development and does not have

a commercial product. Bischoff Decl. ¶ 12. Mr. Mashita does not lead Aeolus' research efforts or technical development. Lee Decl. ¶ 12. Dr. Tobias Bischoff, a climate scientist with a PhD and postdoc from CalTech, leads Aeolus's product research. Bischoff Decl. ¶¶ 2, 6.

There are three main steps to the weather modification system Aeolus is building. First, Aeolus will build its own a physics-based model using a cloud microphysics model and a traditional weather model called "numerical" model, using the combined physics model to simulate a weather event like a hurricane. *Id.* ¶ 14. To predict how a cloud will interact with aerosols, Aeolus must know the principles of the cloud's microphysics: the physics of ice crystals, water droplets and other nanometer-sized particles. *Id.* In an analogy to automobile traffic, weather modification is like broadcasting "Slow down!" through the stereos of certain cars to moderate traffic. *Id.* ¶ 3. The cloud microphysics model would be similar to a model of how an individual driver decides to accelerate, change lanes, or react to hazards in the road. *Id.* Modeling cloud microphysics is notoriously difficult and complex. *Id.* ¶ 15. The physics-based model drives the value of any successful weather modification technology. *Id.* Because running these physics-based models is computationally expensive, Aeolus will use a process called "emulation," where it trains a neural network on data from the physical models it develops to speed up future simulations. *Id.* ¶ 16. The weather physics engine that Aeolus is developing uses the full physics-based model and the emulation of that model. *Id.*

Second, Aeolus will assimilate data into the model. *Id.* ¶ 18. Traditional weather forecasts typically use data from satellites or sensors on the ground. *Id.* Aeolus will use those, plus data from vehicles like planes flying through a hurricane. *Id.* Aeolus will use machine learning to build models that can correct errors in the data and combine data from different sources. *Id.* In the example of automobile traffic, this step would be like collecting and processing data from dashcams in cars on the road. *Id.*

Third, Aeolus will update its weather event simulation with the assimilated data. *Id.* ¶ 19. After Aeolus deploys aerosols, the weather will change. *Id.* Aeolus will collect data to measure the changes and use that data to update the simulation. *Id.* Aeolus will then be able to determine whether or where further deployments are needed. *Id.* In the traffic example, this would be

updating the model of the freeway with data from the dashcams and deciding whether to broadcast "Slow down!" into other cars. *Id.*

Aeolus is not building or offering an AI weather forecasting product. *Id.* ¶ 21. AI weather forecasting models predict what the weather will be in the future, from patterns in the data the models have seen before. *Id.* ¶ 8. This process is similar to predicting upcoming automobile traffic only from past traffic patterns, using data collected from cameras along the highway. *Id.* AI forecasting models have been available and in use since 2020, with NVIDIA's FourCastNet widely considered to be the first. *Id.* By now, AI-based forecasting has been commoditized. Some are open source, and other companies have commercialized their models. *Id.* ¶¶ 9-10. WindBorne, for example, advertises that it combines data collected form its own weather balloons into its WeatherMesh AI forecasting model, which it claims outperforms other "gold standard" physics-based and AI weather models. *Id.* ¶ 10, Ex. C. Like Atmo, WindBorne also advertises that it has U.S. Navy and Air Force contract awards. *Id.* ¶ 10, Ex. D. The technology underlying AI-based forecasting is not a secret; companies often publish their methods. *Id.* ¶ 9, Ex. A.

AI weather forecasting models are not important to Aeolus because AI-based forecasting is especially poor for weather modification. *Id.* ¶ 11. AI-based models can forecast unmodified weather with some accuracy because they use past real-world weather data to predict what the real-world weather will be in the future. *Id.* ¶ 8. Weather modification creates *new* weather through human intervention. *Id.* ¶ 11. There is no evidence that AI-based weather models can predict the effects of these interventions accurately. *Id.* In the example of automobile traffic, an AI model would struggle to predict the effect of broadcasting an audio message of "Slow down!" through the speakers of particular speeding cars because no one has ever done that and no comparable data exists. *Id.*

## II. Mr. Mashita Worked With Atmo As A Student Volunteer And Intern.

Mr. Mashita grew up in Japan, Singapore, and the United States, and in 2022 enrolled at the University of California at Berkeley to study computer science. Mashita Decl. ¶ 9. As a freshman with a keen interest in climate and a growing interest in machine learning, Mr. Mashita reached out to Atmo to seek out an internship opportunity. *Id.* ¶ 10. [redacted]

[redacted] Mr. Mashita, then eighteen years old, signed a Mutual Nondisclosure Agreement with Atmo on November 27, 2022. *See* Declaration of Alexander Levy (Dkt. 15), Ex. A.

As his sophomore year ended in June 2024, Mr. Mashita started a paid summer internship at Atmo. Because he would be receiving a salary, Mr. Mashita signed a consulting agreement with Atmo. Levy Decl., Ex. B. This agreement defined his services as: "Weather forecasting research and development and occasional business development." Levy Decl., Ex. B, at Exhibit A. Mr. Mashita also signed a confidential invention information and inventions assignment agreement. Levy Decl., Ex. C. Mr. Mashita was nineteen at the time. Mashita Decl. ¶ 11.

Mr. Mashita worked on some special projects that were adjacent to Atmo's core technology but rarely touched Atmo's core source code and AI weather forecasting models. *Id.* ¶ 15. Mr. Mashita developed these projects mostly from public data and code he wrote from scratch. *Id.* ¶¶ 16-18. In one example, Mr. Mashita generated statistical noise to use in forecasting hurricanes. *Id.* ¶ 16. He used only public data and no preexisting Atmo code, which he found difficult to understand and use. *Id.* Even in the rare circumstance where Mr. Mashita handled Atmo data, it had little use in applications beyond the specific project he worked on. For example, Mr. Mashita developed a presentation benchmarking an Atmo forecast at a specific site [redacted] to data from the U.S. government. *Id.* ¶ 17. That analysis was only relevant to the times and variables of that particular location at a specific time and was not generalizable to other circumstances. *Id.*

Because of Mr. Mashita and his family's networks in Asia, Mr. Mashita introduced several customer leads to Atmo. Mr. Mashita speaks Japanese, and his father is a well-connected technology investor and entrepreneur in Asia. *Id.* ¶ 12. While he was a summer intern, Atmo asked Mr. Mashita to attend the US-ASEAN Business Council 2024 Singapore Business Mission in Singapore in July 2024. *Id.* ¶ 14. There, Mr. Mashita met with Asian shipping and insurance companies to pitch Atmo products. *Id.* To prepare for engagements with prospective customers,

FENWICK & WEST LLP
ATTORNEYS AT LAW

Mr. Mashita reviewed Atmo documents about existing projects and customer relationships. *Id.* ¶ 13. These informed how he could approach prospective customers and helped him describe what Atmo could offer them. *Id.*

During Mr. Mashita's time at Atmo, information control practices were informal. Atmo never provided Mr. Mashita a computer or phone to use and required him to use his personal MacBook computer and iPhone. *Id.* ¶ 22. [redacted] Much of the information Mr. Mashita encountered was not marked as confidential, and outside of Atmo's source code hosted on GitHub, Atmo did not use any individualized permission structure for document access. Mashita Decl. ¶ 22. Instead, [redacted] No one at Atmo ever told Mr. Mashita what documents he was and was not permitted to access for his work. *Id.* While Atmo now claims that the configuration of the "Shared" folder so that anyone with an Atmo.ai email address could access files in it was "inadvertent," the "Shared" naming convention of the folder belies that explanation.

Though his paid summer internship at Atmo ended in August 2024, Mr. Mashita continued volunteering time into October to help Atmo cultivate the customers connections he made on the Singapore trip. He continued to use the atmo.ai email address he had been given to maintain these sales leads for Atmo, and Mr. Levy continued to email both him and the contacts Mr. Mashita had made in September and October 2024. Mashita Decl. ¶ 21. [redacted]

[redacted] Mr. Mashita did not know when Atmo would stop requesting his help. Mashita Decl. ¶ 21. Atmo never gave Mr. Mashita an exit interview or asked him to return or delete any documents. *Id.* ¶ 28. Atmo asked Mr. Mashita to return his keys to Atmo's office only on November 22, 2024. *Id.* ¶ 21.

Atmo has touted many of its customers publicly. Atmo announced its contract to provide AI weather forecasts to the Philippine government in March 2024. Kropp Decl., Ex. E. Mr. Levy detailed the contract's counterparty (the Philippines), the cost (US$890,000 per year), and the deliverable (frequently updated 14-day forecasts using small geographic divisions across the country). *Id.*, at 4-6. Atmo also broadcasts its clients and projects on its own website. On August 16, 2024, Atmo published a blog post about its two-year-long relationship with the U.S. Department of Defense and Air Force to "help[] military planners track weather systems across theaters of operation." Mashita Decl. ¶ 23, Ex. B. Atmo employees frequently attend (and even speak at) industry conferences, touting Atmo's technology, projects, and customers. *Id.* ¶ 23.

**III. Mr. Mashita Invests In Atmo.**

Both Mr. Mashita and his father invested in Atmo's Seed venture financing round. *Id.* ¶ 25. Atmo also discussed a Series A venture fundraising round with Mr. Mashita, with Mr. Levy sending Mr. Mashita Atmo's Series A pitch deck via Apple's AirDrop to Mr. Mashita's personal device. *Id.* ¶¶ 25-26. Mr. Mashita named this file "Atmo Deck" and kept it on his computer. *Id.* [redacted] In this round, Atmo converted Mr. Mashita's seed investment into

equity and sent investment agreements for Mr. Mashita to sign on November 27, 2024. Mashita Decl. ¶ 25.

**IV. Mr. Mashita And Mr. Lee Created Aeolus Labs.**

After Mr. Mashita's paid internship ended, Mason Lee contacted Mr. Mashita out of the blue on LinkedIn in September 2024 to discuss weather science. Mr. Lee was a senior at Brown University studying atmospheric science, including the use of artificial intelligence models. Lee Decl. ¶¶ 3-6. Mr. Lee had studied weather modification research of Dr. Daniel Rosenfeld, one of the foremost scientists in the weather modification field. *Id.* ¶ 3. Mr. Lee and Mr. Mashita had never met before, but Mr. Lee messaged Mr. Mashita because Mr. Lee believed their interests in weather modification overlapped. *Id.* ¶ 8. At first, the two discussed grand ideas in weather modification—to reduce the catastrophic toll of extreme weather using hurricane suppression. Mashita Decl. ¶ 3. Mr. Mashita and Mr. Lee met in person for the first time on October 10, and as their discussions progressed, they decided to try to operationalize Dr. Rosenfeld's research and form a weather modification company to disrupt destructive storms. The duo incorporated Aeolus Labs in December 2024. *Id.* ¶ 1.

From the onset, Mr. Mashita and Mr. Lee disregarded the idea of developing AI-based weather forecasting as the basis for the hardware and software platform they intended to ultimately commercialize. Lee Decl. ¶¶ 10-11. Mr. Lee knew that AI-based weather forecasting is not fit for weather modification. *Id.* ¶ 11. Because weather modification requires human intervention to change specific weather systems, historical weather data does not capture the effects of that intervention, and any AI model trained on historical weather data cannot accurately predict how weather will react to that intervention. *Id.* Mr. Lee knew this from his undergraduate study, climate work at NASA and CloudFire, and a paper he wrote studying simulation models for aerosolized particles in the atmosphere. *Id.* ¶ 11, Ex. A. Instead, they recognized that they would need to develop a complex cloud physics model.

**V. Atmo Tried to Intimidate Mashita, Then Ignored His Response.**

When Mr. Levy learned in November that Mr. Mashita planned to start a weather modification business, he and Johan Mathe, Atmo's Chief Technology Officer, asked to meet

FENWICK & WEST LLP
ATTORNEYS AT LAW

with Mr. Mashita and Mr. Lee to learn more about their plans. Mr. Mashita and Mr. Lee agreed and met with them on November 13. Mashita Decl. ¶ 30. While Mr. Lee and Mr. Mashita were still solidifying their ideas around what their business would be, they told Mr. Levy and Mr. Mathe that they planned to develop a commercial weather modification product, initially targeted at hurricane reduction, and that they were confident in their ability to raise funding and hire talented scientists, including a leading microphysics researcher they were already working with. *Id.* Mr. Mashita and Mr. Lee also acknowledged that their company would be doing research and development for some time before they had a commercial product and contracts. *Id.* To this day, Aeolus does not yet have a commercial product or customer contracts. *Id.* ¶ 41. Mr. Lee and Mr. Mashita truthfully denied any use of Atmo intellectual property.

[redacted]

On November 21, 2024, Mr. Levy sent a "Draft" letter to Mr. Mashita and Mr. Lee alleging that Mr. Mashita had breached his 2022 nondisclosure agreement and 2024 consulting and confidential information and invention assignment agreements. *See* Levy Decl., Ex. D. Despite noting that the "technical pathway" for weather modification "is constrained by physics and engineering requirements" the letter asserted that Mr. Mashita could not possibly work at a weather modification company without misappropriating Atmo's intellectual property. *See* Levy Decl., Ex. D., at 4. The letter was clearly a threat and demanded that Mr. Mashita and Mr. Lee "[i]mmediately cease all activities related to your competing venture" and not even reference that Mr. Mashita had ever worked for Atmo. *See* Levy Decl., Ex. D, at 6. It also demanded that Mr. Mashita not delete any documents. *See id.*

After receiving Mr. Levy's "Draft" letter, Mr. Mashita engaged an attorney. Mashita Decl. ¶ 32. He also reviewed his personal computer for Atmo documents, finding some miscellaneous

FENWICK & WEST LLP
ATTORNEYS AT LAW

items like the "Atmo Deck" investor pitch presentation Mr. Levy had sent him and images and data for his ad-hoc Atmo projects. *Id*. These documents had no relevance or value to Aeolus. *Id*. Mr. Mashita's attorney wrote to Atmo a few days later and identified these documents by their file names. He asked for Atmo's guidance on what to do with the documents, in light of Atmo's November 21 demand that Mr. Mashita not delete anything. *See* Levy Decl. Ex. E, at 1. The next week, Atmo sent Mr. Mashita investor agreements to sign that told him Atmo had no claims about accessing or misusing proprietary information, including that "there has been no unlawful, accidental or unauthorized access to or use or disclosure of any confidential information and trade secrets" of Atmo. *See* Mashita Decl. ¶ 25, Ex. D, § 2.8(g). Atmo never responded to the request from Mr. Mashita's attorney, and Mr. Mashita believed Atmo considered the matter to be closed. *Id.* ¶ 32. After waiting seven months, Atmo sued Mr. Mashita and Aeolus, claiming that those documents are trade secrets.

Almost one year after Mr. Mashita's alleged unauthorized access to Atmo customer information, Aeolus has no product and no customers. Mashita Decl. ¶ 41; Bischoff Decl. ¶ 13. [redacted] Aeolus did not meet with any of these three for over six months after Mr. Levy's accusations and has not won any contracts or grants. *Id*. Neither Mr. Mashita nor anyone at Aeolus discussed Atmo information to pitch these customers or used any Atmo proprietary information for Aeolus in any way. Mashita Decl. ¶ 45; Lee Decl. ¶ 14; Bischoff Decl. ¶ 6.

## ARGUMENT

### I. Legal Standard

Preliminary injunctions are an "'extraordinary' equitable remedy that are 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008)). A plaintiff seeking a preliminary injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is

FENWICK & WEST LLP
ATTORNEYS AT LAW

in the public interest. *Starbucks Corp.*, 602 U.S. at 346. The plaintiff must prove these elements with "a clear showing," *Winter,* 555 U.S. at 22, and meeting this burden is "a difficult task." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). Atmo falls short of that high bar.

**II. Atmo Is Unlikely To Succeed On The Merits Of Its Trade Secret Claims.**

A plaintiff claiming misappropriation of trade secrets must prove three elements: that it possesses a trade secret, that the defendant misappropriated that trade secret, and that the misappropriation damaged or threatened damage to the plaintiff. *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020). Atmo made claims under both the federal and California trade secret statutes, which courts analyze together. *Id.* at 657. A trade secret is information that (1) derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of reasonable efforts to maintain its secrecy. *See* Cal. Code Civ. Proc. § 3426.1(d); 18 U.S.C. §§ 1839(3)(A) & (B). The plaintiff "must identify the trade secrets and carr[ies] the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993). A plaintiff also must show that the defendant misappropriated the trade secret by disclosing or using the trade secret without implied or express consent, or by acquiring it through improper means. *See* Cal. Code Civ. Proc. § 3426.1(b); 18 U.S.C. § 1839(5). Atmo has not shown actual or even threatened misappropriation.

**A. Mr. Mashita Had Permission To Access Files In Atmo's Shared Storage.**

Mr. Mashita, and by extension Aeolus, did not misappropriate Atmo's trade secrets. [redacted] But Atmo permitted Mr. Mashita's access to these documents. Mr. Mashita's job description as a summer intern included business development and product research. Levy Decl. Ex. B. at Exhibit A, Mashita Decl. ¶ 11. [redacted]



FENWICK & WEST LLP ATTORNEYS AT LAW

[redacted]

Even after the end of his paid internship, Mr. Mashita continued to perform business development work for Atmo into the fall, helping Atmo deepen the connections he had made on the Singapore trip. Atmo had him keep his Atmo.ai mail address, Google Drive access, and office keys throughout this time. Mashita Decl. ¶ 21. [redacted] Atmo knew about Mr. Mashita's access to his Atmo email and Google Drive and allowed them.

Mr. Mashita also received and reviewed documents about Atmo's business as an investor. Mashita Decl. ¶ 25. For a Series A venture round that Atmo was considering raising, Atmo prepared a pitch deck, summarizing Atmo's business, customers, and prospects. *Id.* at ¶ 26. Mr. Levy himself transferred the pitch deck directly to Mr. Mashita, and Mr. Mashita renamed the file "Atmo Deck." *Id.* ¶ 26. [redacted] Mashita Decl. ¶ 25. Mr. Mashita reviewed Atmo's investor materials as any diligent investor would, especially one who was still working for the company.

When Mr. Mashita told Mr. Levy that he planned to launch a weather modification startup with Mr. Lee, Atmo's tone changed. In November 2024, Atmo told him that he could not work in the field of weather modification without misappropriating Atmo's IP because he would need to "develop capabilities in areas where you received detailed training" and demanded that he preserve all Atmo documents. Levy Decl. Ex. D at 4, 6. Mr. Mashita promptly reviewed the files

FENWICK & WEST LLP
ATTORNEYS AT LAW

on his computer for any Atmo documents that remained, and through his attorney, asked Mr. Levy to "provide guidance regarding what Atmo would like Mr. Mashita to do with these files." Levy Decl. Ex. E at 1. Atmo never responded, leaving Mr. Mashita with an impossible choice: delete the documents and face allegations of evidence destruction, or keep them and face allegations that he was using them. Without further communication from Atmo, Mr. Mashita preserved the documents, as Mr. Levy's letter had demanded. Mashita Decl. ¶ 32.

### B. Mr. Mashita Did Not Misappropriate Source Code.

Mr. Mashita did not keep source code for Atmo's AI weather forecasting models. *Id.* ¶ 20. Contrary to Mr. Levy's speculation that "Atmo Deck" referred to Atmo's source code, that file was a simple "pitch deck" slideshow that Atmo used to pitch its business to potential investors. *Id.* ¶¶ 20, 26. Atmo could have cleared this up by simply asking nine months ago. [redacted] There is no evidence that Mr. Mashita downloaded and retained Atmo's AI weather forecasting source code, because he did not.

### C. Defendants Do Not And Will Not Use Atmo's Claimed Trade Secrets, Which Have No Value Outside Atmo.

[redacted] There is no evidence Mr. Mashita or Aeolus has used or is threatening to use those discrete documents or the information contained in them. Most concern discrete Atmo projects that have little, if any relevance outside of Atmo or the projects they concern, and all are now more than a year old.

Atmo makes its case around high-level task lists in two customer documents. Br. at 10-11. The first, [redacted]

[redacted] Each of Atmo's task lists is valuable only for Atmo to organize its personnel for the specific project at hand. No competitor could replicate those projects from these documents alone. By now, these documents are also more than a year stale.

[redacted] Aeolus has no customers. Mashita Decl. ¶ 41. Knowing the names of Atmo's customers is not a secret nor useful to Aeolus because, as discussed below, Atmo publicizes its engagements and there are limited buyers in the world of weather modification technology. Atmo's fear seems to be that Aeolus used Atmo secrets to expedite Aeolus's application process with [redacted] (Br. at 8), but that makes little sense. Some [redacted] requests are open solicitations for technology that the agency could use, if the business finds the right use case. Mashita Decl. ¶ 35. Phase I helps the business match a customer and end user in the agency. *Id.* Since that department has very few weather units, Aeolus knew its potential customers for weather modification and did not need to go through Phase 1. *Id.* Aeolus also streamlined its application process using a government contracts consultant that Aeolus engaged long after Mr. Mashita left Atmo. *Id.* Aeolus's contacts with

FENWICK & WEST LLP
ATTORNEYS AT LAW

Atmo's customers are fleeting, have not resulted in any contracts, and in no way incorporate any secret information about what Atmo was doing with these customers a year ago.

There is also no evidence that Aeolus has used or even could use any technical documents that remained on Mr. Mashita's computer. For example, Mr. Mashita created the "white_sands_scoring presentation" and more than 60 files—mostly graphics files—for that presentation. Levy Decl. ¶ 41. That work compared an Atmo wind forecast for a specific location and date against real world and publicly available NOAA data. Aeolus has not used or referred to it, and the performance of Atmo's AI forecast for one location at a point in time has no bearing on weather modification hardware and measurement models that will measure the impact of human interventions on storm systems. Mashita Decl. ¶ 17. [redacted]

Indeed, a flaw central to all of Atmo's trade secret claims is that the documents it identifies have limited if any value outside of Atmo. Trade secrets must have independent economic value from not being generally known to others. Cal. Code Civ. Proc. § 3426.1(d)(1); 18 U.S.C. § 1839(3)(B). Almost all the information that remained on his computer consists of his ad-hoc work, written from scratch, or using public data. Mashita Decl. ¶ 20. He used those to draft presentations, some of which he never even gave. Mashita Decl. ¶ 16. If these had any value, Atmo would have asked for them back when Mr. Mashita offered. But Atmo did not.

### D. Atmo's Claim Of Threatened Misappropriation Is Based On The Rejected Inevitable Disclosure Doctrine.

At bottom, Atmo's theory is that Mr. Mashita necessarily must use or disclose Atmo trade secrets to work in the field of weather modification, and by extension, can never work for anyone other than Atmo in a field that touches upon weather forecasting. This is evidenced in Atmo's "Draft" letter in which it claimed that Mr. Mashita could not work on weather modification without drawing upon what he learned at Atmo. Levy Decl. Ex. D at 4. Atmo is wrong on both the law and facts.

First, the inevitable disclosure doctrine has been "flatly rejected in this state as incompatible with the strong public policy in favor of employee mobility." *Cypress Semiconductor Corp. v. Maxim Integrated Prods., Inc.*, 186 Cal. Rptr. 3d 486, 504 (Cal. Ct. App. 2015); *see also ELT Sight, Inc. v. EyeLight, Inc.*, No. LA CV19-05545 JAK(RAOx), 2020 WL 7862134, at *16 (C.D. Cal. Aug. 28, 2020) (noting that courts in California considering both DTSA and CUTSA claims have rejected the inevitable disclosure doctrine) (collecting cases). The doctrine assumes, based on circumstantial evidence, that a former employee will use knowledge of a former employer's trade secrets in new employment. Courts reject this because it "is not merely an injunction against the use of trade secrets, but an injunction restricting employment." *Whyte v. Schlage Lock Co.,* 125 Cal. Rptr. 2d 277, 292 (Cal. Ct. App. 2002). That is precisely what Atmo is trying to do here, as it made plain in Mr. Levy's "Draft" letter.

Atmo is also wrong on the facts. Atmo and Aeolus both engage in weather measurement, but that is where the overlap ends. Aeolus and Atmo use fundamentally different tools to answer different questions in weather science. Aeolus is building a different product than anything Atmo offers or plans to offer: a hardware and software platform for weather modification with its own physics-based model. This aims to change an extreme weather event by deploying aerosols from a plane equipped with Aeolus's hardware. Bischoff Decl. ¶ 12. [redacted]

Atmo attempts to bridge this gap claiming that Aeolus must use AI forecasts for weather modification. Br. 2. Atmo is wrong. While AI models, trained on historical weather data, may be helpful to forecast weather events similar to those in the past, AI models cannot accurately simulate weather patterns from stimuli that scientists have never observed. Lee Decl. ¶ 11; Bischoff Decl. ¶ 11. Even an employee of Rainmaker Technology Corp, Atmo's new partner that does offer weather modification products, admitted that Atmo's forecasts were not helpful. Mashita Decl. ¶ 44. For this reason, Aeolus is building its own physics-based models from the ground up, combining public numerical weather prediction models with Aeolus's own cloud

FENWICK & WEST LLP
ATTORNEYS AT LAW

microphysics model. Bischoff Decl. ¶ 14. Mr. Mashita is not involved in developing these models. *Id.* ¶ 5.

**E. Many Of Atmo's Alleged Trade Secrets Are Vague Concepts Or Public.**

Because information known in the trade is not protectable, a trade secret plaintiff must specify the trade secret with reasonable particularity to distinguish it from general knowledge. *Whyte,* 125 Cal. Rptr. 2d at 285. [redacted]

Courts scrutinize two types of purported trade secrets that often lack reasonable particularity: customer information and technical methods. Employees are entitled to take "general knowledge" about customers, like sales numbers and pending orders, when leaving an employer. *Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp.2d 911, 967 (C.D. Cal. 2011) (citing *Metro Traffic Control, Inc. v. Shadow Traffic Network,* 27 Cal. Rptr. 2d 573, 578 (Cal. Ct. App. 1994)). Courts must ensure that a former employer specifies only protectable information "[t]o prevent employers from using trade secret law as a weapon against employee mobility." *Mattel Inc.,* 782 F. Supp. 2d at 967. Second, a plaintiff must identify technical specifications and methods with particularity. "Catchall" categories information are not protectable trade secrets; the plaintiff must identify "precise numerical dimensions" if it claims technical specifications as trade secrets. *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998).

**Publicly Available AI-Based Forecasts.** AI weather forecasting is not a trade secret that Atmo owns. NVIDIA led AI-based weather forecasting with its release of FourCastNet, a model that it published open-source, years ago. Bischoff Decl. ¶¶ 8-9. Many other open-source and commercial AI forecast models trailed NVIDIA, like those from Google, Huawei, Microsoft, CalTech, and Chinese universities. *Id.* ¶ 9. Aeolus's Head of Research, Dr. Bischoff himself worked with the climate scientists behind these models six years before joining Aeolus. *Id.* ¶ 8.

[redacted]

FENWICK & WEST LLP
ATTORNEYS AT LAW

[redacted]

The word salad of paragraph 10 of Atmo's amended trade secret disclosure fails to identify with any particularity what distinguishes Atmo's AI weather forecasts from the masses. The only description of any purported secrets in Atmo's technology are nine general categories of technology, like "models," "source code," "metrics," or the simulation "recipe," all regurgitated verbatim from the complaint. *See* Br. at 15; Compl ¶¶ 63, 69. These "catchall" aspects of a technological product cannot be trade secrets. *See Imax Corp.*, 152 F.3d at 1164.

**Negative Knowhow.** Similarly, Atmo does not adequately identify what "negative knowhow" about its AI weather forecasting models is a protectable trade secret. If that negative knowhow is that physics-based models are superior to AI-based models for weather modification, there is nothing novel to that understanding. Bischoff Decl. ¶ 11. Physics-based models have been the dominant weather forecasting methodology for decades. Atmospheric scientists understand well the limits of using an AI model, which is trained on historical data, to predict the effect of human interventions on weather systems. *Id.*, at Ex. E. This is not "negative knowhow" that Atmo somehow owns.

**Atmo's Public Customers.** Atmo's current and past customers are not secret. Atmo has no qualms naming its customers in its pleadings, on its website, and in press releases. *See* Br. at 3 (naming Tuvalu, the Philippines, and Rainmaker as Atmo customers). [redacted] Atmo talks about its customers and its projects extensively in the media. Mr. Levy gave an interview crowing about Atmo's contract with the Philippines, describing both the deliverable and its cost. Kropp Decl., Ex. E, at 6. Atmo even hosted an event at the SF Climate Week conference for a "behind-the-scenes look at how Atmo's new AI forecast rapidly learned and delivered precise forecasts during this extraordinary sequence of storms" in the Philippines. *Id.*, Ex. G. Atmo likewise publishes about its work with the U.S. Department of Defense and Air Force, which are also disclosed in public records publishing SBIR awards. Kropp Decl., Exs. H-J. [redacted]

[redacted] Atmo also admits that there is no secrecy in the identities of potential buyers of weather modification technology because the pool is small: "[t]he customer base is restricted to specific government agencies, militaries, and commercial entities who are interested in weather modification." Levy Decl. Ex. D at 4.

### F. Atmo Did Not Use Reasonable Measures To Protect Its Trade Secrets.

A plaintiff must use reasonable measures to protect the secrecy of its purported trade secrets. Atmo has not done so. [redacted] But confidentiality agreements with vague descriptions of the protected information and no measures to enforce them "are largely meaningless" to this analysis. *Mattel, Inc.,* 782 F. Supp. 2d at 959. In many cases, an employer's failure to mark documents confidential defeats any misappropriation claim. *Id.* And a plaintiff has no reasonable measures to keep its information secret if it fails "to take prompt action to protect its trade secrets." *See Cypress Semiconductor Corp. Superior Ct.*, 163 Cal. App. 4th 575, 588 (Cal. Ct. App. 2008).

Atmo had virtually no other measures to keep its information secret within the company or to ensure that employees, contractors, and interns did not retain documents when they stopped working for Atmo. [redacted]

Fenwick & West LLP
Attorneys at Law

[redacted] Simply having employees and contractors sign nondisclosure agreements is not a sufficient measure.

**III. Atmo Is Unlikely To Succeed On The Merits Of Its Breach Of Contract Claim.**

Atmo's breach of contract claim fails for the same reasons its misappropriation claim fails: Mr. Mashita was entitled to access the information he viewed. Atmo makes only passing argument in support of its breach of contract claim, duplicating its misappropriation claims. Those arguments fail for the same reasons Atmo's misappropriation claims fail.

Atmo has waived, and is estopped from asserting, its claims to the extent it now alleges Mr. Mashita failed to return or delete files from the personal computer Atmo required him to use after the end of his paid internship. Br. at 22. Mr. Mashita's attorney identified the specific files on Mr. Mashita's computer on November 26, 2024 and requested guidance on how to handle them. Days later, Atmo sent Mr. Mashita investor documents to sign, representing that Atmo had no claims for misusing any confidential information or trade secrets. *See* Mashita Decl. ¶ 25, Ex. D, § 2.8(g). By ignoring his attorney's request, telling him it had no intellectual property claims, and staying silent until filing this lawsuit in July, Atmo waived (and is estopped from making) any claim based on his handling of Atmo documents. A party waives rights when its acts are "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." *Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 95 Cal. Rptr. 2d 583, 592 (Cal. Ct. App. 2000). Similarly, a party is estopped from asserting rights when it induces the counterparty into action or inaction, to the counterparty's detriment. *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 215 Cal. Rptr. 3d 835, 852-853 (Cal. Ct. App. 2017). Mr. Mashita reasonably believed from Atmo's months of silence that this dispute was over. Nevertheless, he continued to preserve the documents, as Atmo had demanded in its "Draft" letter. This dispute would not exist had Atmo answered Mr. Mashita's attorney's question.

Finally, Atmo tacks on an entirely unsupported allegation that Mr. Mashita developed Aeolus's intellectual property in the course of his Atmo consultancy, Br. at 22. This theory fails. Atmo admits that Mr. Mashita received his final paycheck on August 26, 2024, Br. at 5, before

Mr. Mashita even met Mr. Lee on September 10, 2024 or conceived of any idea that would become Aeolus. Mashita Decl. ¶ 3.

## IV. Atmo Has Not Shown A Threat Of Irreparable Harm.

Atmo bears the burden of showing that it is likely to imminently suffer an actual injury—not a speculative injury that is merely possible. *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Mere claims of potential future loss of customers are too speculative to justify a preliminary injunction. *See*, *e.g., Goldie's Bookstore, Inc. v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984). In trade secret cases, a plaintiff seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm, even when it is likely to succeed on the merits. *Diversified Silicone Prods. Corp. v. Elastapro Silicone Sheeting LLC*, No. CV 20-2010 PSG (PJWx), 2020 WL 4390380, at *2 (C.D. Cal. May 19, 2020). Atmo's failure to offer any evidence that it has been or is threatened with imminent, irreparable injury requires denial of its motion.

### A. Atmo's Lengthy Delay Defeats Any Claim Of Irreparable Harm.

"A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (reversing grant of preliminary injunction). A long delay before seeking a preliminary injunction "implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). As one district court held in a trade secret case with far greater evidence of threatened injury than the thin record before this Court, the plaintiff's delay of seven months after first suspecting misappropriation showed there was no exigent need for injunctive relief. *See Diversified Silicone Prod. Corp.*, 2020 WL 4390380, at *3; *see also Kolay v. Milliken,* No. 2:18-CV-00640 SVW (KSX), 2018 WL 1942709, at *4 (C.D. Cal. Mar. 22, 2018) (delay of nine months showed absence of threat of irreparable injury). Like here, the plaintiff in *Diversified Silicone Products* sent a demand letter to the defendants seven months before filing its motion. *See* 2020 WL 4390380, at *3. Also like here, the plaintiff based its preliminary injunction motion on the same evidence it knew about seven months earlier. *Id.* That court denied a preliminary injunction because of the delay, *id.* at *1, and this Court should too.



FENWICK & WEST LLP
ATTORNEYS AT LAW

Atmo knew all of the relevant facts by November 26, 2024 and did nothing until July 2025. *See* Br. at 7. In November, Atmo knew the documents that Mr. Mashita accessed and the documents he still had on his computer. Br. at 10-12. Atmo analyzed Mr. Mashita's Google Drive logs, and formed a belief that he looked at documents he should not have. Br. at 7. While Atmo tries to explain away its delay with Mr. Mashita and Mr. Lee's assurances that they would not use Atmo's trade secrets (which remain true), Atmo cannot overlook that the duo told Atmo on November 13, 2024 [redacted]

As in *Diversified Silicone Products*, Atmo crystallized its allegations in November 2024 when it sent a "Draft" letter to Mr. Mashita and Mr. Lee making exactly the same claims it makes today. *See* Br. at 7; Levy Decl. Ex. D, at 2-4. And when Mr. Mashita's attorney responded, asking Atmo what to do with the specific files on Mr. Mashita's computer (Levy Decl. Ex. E, at 1), Atmo had several options. It could have requested proof of deletion of the files. It could have requested a forensic examination of his computer. Or, if Atmo had truly believed it faced a threat of harm, it could have brought the lawsuit and motion it waited until July to file. Instead, it did nothing and stayed silent for more than seven months only to spring its claim at a time when it likely believed it could best interfere with Aeolus's attempts to raise venture capital. Br. at 9. Atmo's lawsuit is not driven by any harm it may suffer. Instead, it is trying to make good on Mr. Mathe's promise that [redacted]

### B. Atmo Has No Evidence Of Any Actual Or Threatened Harm.

Regardless of Atmo's delay, Atmo has shown no threat of irreparable harm. Mr. Mashita's alleged misappropriation took place between August 20, 2024 and November 26, 2024. Ten months have passed, and Atmo still cannot allege any concrete harm. Atmo cites only two facts to support its argument of irreparable harm. First, Atmo claims that it values confidentiality. Br. at 23 (citing Levy Decl. ¶ 9). This is a statement of Atmo's beliefs and not a claim of any harm. Second, Atmo claims that it is implausible that Defendants could have met with any potential customers without stealing Atmo's information. Br. at 23-24 (citing Levy Decl. ¶¶ 23-24). This is

FENWICK & WEST LLP
ATTORNEYS AT LAW

nothing more than rank speculation. As Atmo and Mr. Levy acknowledged, there is no secrecy in the potential buyers of weather modification services. *See* Levy Decl. Ex. D. at 4.

Even if there were a morsel of truth to Atmo's argument (there is not), this is still not an allegation of any harm. Atmo has not alleged any lost customer, and Aeolus has no customers. Atmo has not alleged any lost contract, and Aeolus has no products currently available. Atmo has not even alleged that any customer *mentioned* Aeolus to Atmo. Even in the Complaint, Atmo can only allege "on information and belief" that it has been harmed. *See* Compl. ¶ 90. Atmo's failure to allege harm concretely is an admission that Atmo has suffered no harm at all.

Instead, Atmo relies on a presumption of irreparable harm. *See* Br. at 23. This is wrong on three fronts. First, not all courts in this circuit presume irreparable harm in trade secret misappropriation cases. *See Diversified Silicone Prod. Corp*, 2020 WL 4390380, at *3; *Veliz v. Cintas Corp.*, No. C 03-1180 SBA, 2004 WL 2452851 (N.D. Cal. Apr. 5, 2004); *see Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003); *Symantec Corp. v. McAfree Assocs., Inc.*, No. C-97-20367 JF EAI, 1998 WL 740798, *2 n.6 (N.D. Cal. Jun. 9, 1998). Second, Atmo admits that, at best, it can receive a rebuttable presumption of irreparable harm only if Atmo shows that it is likely to succeed on the merits. Atmo is not likely to succeed on the merits. And third, even if Atmo were entitled to a presumption of harm, Atmo still must rebut Defendants' evidence that Atmo has not been harmed. It cannot.

## V. The Balance Of Hardships To The Parties And The Public Interest Do Not Favor A Preliminary Injunction.

In considering a preliminary injunction motion, a court must identify the harms which a preliminary injunction might cause to the defendant and weigh these against the plaintiff's threatened injury. *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). Atmo's failure to act tips the equities in Defendants' favor. Atmo has not shown that it has been harmed at all, let alone that it will bear any burden if the Court does not grant a preliminary injunction. The burden on Defendants is not merely complying with the law (they already are). The burden on Defendants is Atmo's weaponization of litigation that

could have been avoided if Atmo simply responded to Mr. Mashita's inquiry about what to do with his documents.

In addition to the effect of a preliminary injunction on the parties, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Aeolus is developing weather modification technology—something that Atmo does not—which has the capability of reducing natural disasters. There is no public interest in allowing a company like Atmo to lay in wait until most damaging moment to harm a perceived competitor. Preliminary injunctions should issue only in urgent cases.

**VI. The Court Should Disregard Mr. Doricko's Testimony.**

The Court should exclude Mr. Doricko's testimony because Defendants had no opportunity to cross-examine him due to his evasion of service. Mr. Doricko is not a neutral party. He is CEO of Rainmaker, a weather modification drone company that formed a partnership with Atmo announced one week before Atmo filed this case. Levy Decl. ¶ 5. Rainmaker is a potential future competitor of Aeolus and stands to gain from Aeolus's distraction and expense of litigating this case. Unsurprisingly, Mr. Doricko cooperated with Atmo to submit a declaration in support of Atmo's preliminary injunction motion. *See* Declaration of Augustus Doricko (Dkt. 16).

Mr. Doricko evaded service when Defendants tried to subpoena him. Defendants first tried contacting Mr. Doricko through Atmo's counsel, starting on August 6, 2025. Kropp Decl. ¶ 10. This was not successful. Atmo's counsel could not even provide any email information for Mr. Doricko himself, even though they received a signed electronic copy of his declaration in this case. *Id.*, Ex. K. Mr. Doricko also evaded six service attempts at his home and business from August 11-13, 2025. Kropp Decl. ¶ 10. Defendants' counsel also contacted Mr. Doricko by email to ask if he was represented by counsel. *Id.*, Ex. L. Mr. Doricko never responded. *Id.* While Mr. Doricko evaded service attempts, he appeared on a podcast with Mr. Levy, published on August 15, 2025. *Id.* at Ex. M.

Mr. Mashita vigorously disputes Mr. Doricko's recount of the conversation described in Mr. Doricko's declaration. Mashita Decl. ¶ 44. But without deposing Mr. Doricko, Defendants

FENWICK & WEST LLP
ATTORNEYS AT LAW

cannot punch holes in his testimony. Courts have inherent powers to make evidentiary rulings to ensure the fairness of proceedings in their courtrooms, which include the ability to exclude a witness's testimony at trial, considering the prejudice to the opposing party. *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992). The Court should exclude his testimony to protect the fairness of this adversarial proceeding.

**VII. Atmo Should Post A Bond If The Court Enjoins Defendants.**

A court may issue a preliminary injunction only if the movant provides security to pay the nonmovant's costs and damages if the court determines that it wrongfully enjoined the nonmovant. Fed. R. Civ. P. 65(c). At a minimum, Atmo's proposed order would require Defendants to preserve every document related to development of Aeolus's models or technology. Such a sweeping order would freeze in place virtually every document in the company. While Defendants have already implemented appropriate preservation holds for information potentially relevant to this case, Aeolus's entire company is not relevant to this case. Atmo should post a bond to allow Defendants to recover costs of compliance if the Court wrongfully enjoins Defendants.

**CONCLUSION**

For the above reasons, the Court should deny Atmo's motion for preliminary injunction.

Dated: August 26, 2025

FENWICK & WEST LLP

By: /s/ Tyler Newby
Tyler Newby
Garner Kropp
Joan Liu-Kim
Julian Sarabia

Attorneys for Defendants KOKI MASHITA and AEOLUS LABS, INC.